United States District Court
Southern District of Texas
**ENTERED**
January 08, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| JESUS SOLIZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:23-CV-00107 |
| | § | |
| NUECES COUNTY, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

## MEMORANDUM AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Jesus Soliz, a Texas prisoner appearing *pro se* and *in forma pauperis*, has filed this civil rights lawsuit against 14 defendants under 42 U.S.C. § 1983.   Among other claims, Plaintiff broadly alleges that the defendants were deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution while Plaintiff was confined at the Nueces County Jail as a pretrial detainee.  *Id.* For the reasons discussed below, the undersigned recommends that Plaintiff's lawsuit be DISMISSED.

### A.   Jurisdiction.

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

**B.  Background.**

**1.  The parties.**

Plaintiff is currently a prisoner in the Texas Department of Criminal Justice-Correctional Institutions Division (TDCJ-CID), housed at the LeBlanc Unit in Beaumont, Texas.  (Doc. No. 13, p. 3.)  His lawsuit, however, concerns alleged incidents that occurred while he was a pretrial detainee at the Nueces County Jail in Corpus Christi, Texas.

Plaintiff names 14 defendants in this case (collectively, the "Defendants"):

- Nueces County, Texas;

- Nueces County Sheriff John Hooper ("Sheriff Hooper");

- Armor Correctional Healthcare Services ("Armor"), a company that was allegedly contracted to provide health care services to inmates at the Nueces County Jail;

- Doctor Robert Cano ("Dr. Cano"), a physician allegedly employed by Armor;

- Registered Nurse ("RN") and Clinical Operation Specialist Barbara Wisniewska ("Nurse Barbara"), allegedly employed by Armor;

- Physician Assistant Steve Doe ("PA Steve"), allegedly employed by Armor;

- Licensed Vocational Nurse ("LVN") Thelma Doe ("Nurse Thelma"), allegedly employed by Armor;

- LVN Marsha Doe ("Nurse Marsha"), allegedly employed by Armor;

- LVN Tamara Doe ("Nurse Tamara"), allegedly employed by Armor;

- Supervising RN Evonne Doe ("Nurse Evonne"), allegedly employed by Armor;

- LVN Tina Doe ("Nurse Tina"), allegedly employed by Armor;

- LVN Betty Doe ("Nurse Betty"), allegedly employed by Armor;

- LVN Jennifer Doe ("Nurse Jennifer"), allegedly employed by Armor; and

- Nueces County Deputy Sheriff John Matthew ("Deputy Matthew").

(Doc. No. 1.)

### 2. *Plaintiff's allegations.*

Plaintiff makes the following factual allegations in his complaint (Doc. No. 1) and in his responses (Doc. Nos. 13, 14) to the Court's questionnaire (Doc. No. 10).  The Court accepts all of these factual allegations as true for purposes of this screening review.

Plaintiff arrived at the Nueces County Jail in August 2020 as a pre-trial detainee.[1]  (Doc. No. 13, p. 23.)  Plaintiff states that he suffers from high blood pressure and that he was taken to Christus Spohn Hospital—Shoreline ("Spohn Hospital") for diagnostic evaluation and treatment upon arriving at the jail.  *Id.*  Plaintiff was then transferred to the jail's McKenzie Annex.  *Id.*  Plaintiff alleges that in or around November 2020, Nueces County began to contract with Armor to provide medical care services for its jails.  *Id.*

In a conversation with Dr. Cano, Plaintiff purportedly learned that Nueces County contracted with Armor in order to reduce expenses related to inmates' medical care, specifically by allegedly limiting medical staff's ability to approve emergency medical treatment and transfers to outside medical facilities unless inmates faced "a dire emergency involving life or death."  (Doc. No. 13, p. 16.)  According to Dr. Cano, this alleged "cost containment policy" prevented medical staff from approving emergency medical treatment or transport for other serious medical needs, threatening to harm inmates in need of "crucial" medical services.  (Doc.

---

[1]  The undersigned takes judicial notice of the fact that Plaintiff was a pretrial detainee during the time of the events alleged in the complaint.  *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998) (allowing a court to take judicial notice of a "document filed in another court . . . to establish the fact of such litigation and related filings, [but not] . . . of the factual findings of another court"); *see also* Fed. R. Evid. 201(c)(1).  Plaintiff was indicted in Texas state court for sexual assault, a second-degree felony, on July 1, 2020.  He pleaded guilty and was sentenced on September 30, 2022.  *See Public Portal*, NUECES CNTY. DIST. CLERK'S OFF., https://portal-txnueces.tylertech.cloud/Portal/ (Smart Search: "20FC-1942H") (last visited Dec. 11, 2023).

No. 13, pp. 14, 16-17.)  Nurse Barbara was allegedly the only person with the authority to decide whether inmates needed emergency medical care and transport to an offsite facility, despite her having "no direct observation, examinations, or contact with the inmates;" allegedly, no other medical provider could make such decisions.  *Id*. at 16-17.  Plaintiff contends that Sheriff Hooper was "fully aware" of the "cost containment policy" in the contract between Nueces County and Armor.  *Id*. at 16.

Plaintiff asserts that it was around the time when Nueces County began its contract with Armor that he began experiencing problems with his medical care.  (Doc. No. 13, p. 16.)  Plaintiff refers to these initial problems, which he first presented in his response to the Court's questionnaire (Doc. No. 13), as the "first episode," which he reasons will be beneficial to provide context of the history of inadequate medical treatment by Defendants in this case.  *Id*.  The undersigned briefly summarizes this "history" here before describing the main claim of Plaintiff's complaint, which Plaintiff dubs the "second episode."

### a. The "first episode."

Plaintiff contends that, in or around November 2020, when Nueces County began to contract with Armor, he began suffering symptoms allegedly caused by his high blood pressure.  (Doc. No. 13, pp. 23-24.)  Plaintiff also sought treatment for a tooth infection, an ear infection, and various cold-like symptoms in late January 2021.  (Doc. No. 13, p. 24.)  He filed several requests, which medical staff acknowledged, stating that Plaintiff had received antibiotic medication, ear drops, and cold medicine but that there would be a delay in any additional treatment because of a unit quarantine.  *Id*.; *see also* Doc. No. 13-1, pp. 5-9.  Plaintiff also requested ear surgery, but medical personnel responded that the surgery could not be provided because it was not classified as an emergency.  (Doc. No. 13-1, p. 9.)

Soon after, on or around February 21, 2021, Plaintiff allegedly complained to the director of Human Services at the McKenzie Annex, one "Director Washington," that Nurse Marsha, one of the named defendants, was discriminating against Plaintiff and refusing him proper medical treatment.  (Doc. No. 13, p. 25.)  Plaintiff states that Director Washington assured Plaintiff that his complaint would be addressed by his office.  *Id*.  Plaintiff alleges that he was then "unexpectedly" transferred from the McKenzie Annex to the main Nueces County Jail and placed in "lockdown" for 23 hours each day, which Plaintiff describes as a lockdown on the entire wing.  *Id*.  In response, Plaintiff filed several grievances, accusing Nurse Marsha of retaliating against Plaintiff for reporting her.  *Id*.; *see also* Doc. No. 13-1, pp. 19-22.  During a visit to the medical infirmary, Dr. Cano, one of the named defendants, allegedly "informed" Plaintiff that Nurse Marsha fabricated allegations that Plaintiff had made inappropriate remarks about a female physician assistant at the McKenzie Annex, which was what prompted his transfer (for that physician assistant's safety).  (Doc. No. 13, p. 26; Doc. No. 13-1, p. 20.)

Plaintiff states that he continued to experience medical symptoms related to his ear infection during his confinement at the Nueces County Jail.  (Doc. No. 13, p. 27; Doc. No. 13-1, pp. 11-12.)  Plaintiff states that, after Director Washington assured Plaintiff that his medical needs would be taken care of by Armor, Dr. Cano prescribed Plaintiff "greatly need[ed]" antibiotic medication.  (Doc. No. 13, p. 28.)  Plaintiff remained confined at the main Nueces County Jail until he was transferred back to the McKenzie Annex on May 6, 2021.  *Id*.

Plaintiff has submitted inmate communication forms reflecting 15 written requests between November 2020 and April 2021 seeking medical attention for his various symptoms.  (Doc. No. 13-1, pp. 1-13, 19-22.)  Plaintiff's submitted documentation shows responses by medical staff to 12 of those requests.  *See id*. at 1-13.  In most of these responses, medical staff

noted, at different times, that Plaintiff had been referred to be seen by a medical provider, that he was on a waiting list to be seen by a medical provider, or that he would be seen when Plaintiff's unit was no longer in quarantine.  *Id*. at 1-5, 7, 12-13.  One note stated that the waiting list "averages several weeks – it is a long waiting list."  *Id*. at 3.  In other responses, medical staff either clarified Plaintiff's already-in-progress medical care or instructed Plaintiff about his medication.  *See id*. at 6, 9-11.

### b.  The "second episode."

#### i.  Pre-hospitalization.

On May 6, 2021, Plaintiff was transferred from the main Nueces County Jail back to the McKenzie Annex.  On that day, Plaintiff allegedly began suffering from "excruciating pains in the abdom[en], stomach, lower back, and kidney[s]," which caused, among other symptoms, vomiting, shortness of breath, and fever.  (Doc. No. 1, p. 4; Doc. No. 13, p. 28.)  Upon arriving at the McKenzie Annex, Plaintiff informed medical staff of his symptoms and requested medical attention, including by written request.[2]  (Doc. No. 13, p. 28; Doc. No. 13-1, pp. 14-15.)  Plaintiff's submitted documentation reflects that, in response to Plaintiff's written requests, medical staff replied that Plaintiff was scheduled to be seen by a provider and that he had been seen at least twice already and was receiving medication for his symptoms.  (Doc. No. 13-1, pp. 14-15.)

Plaintiff alleges that on "at least" two occasions between May 6 and May 12, 2021, when Plaintiff was experiencing "violent" vomiting episodes, certain correctional officers would be called to Plaintiff's dorm and escort Plaintiff to the infirmary, but that Plaintiff would be turned away.  (Doc. No. 13, p. 30.)  Plaintiff's submitted inmate communication forms note that

---

[2]  Plaintiff includes with his pleadings three inmate communication forms that he submitted over the course of his "second episode."  *See* Doc. No. 13-1, pp. 14-16.

Plaintiff was scheduled to be seen for follow-up on May 7, 2021, and that he had already been

seen during two nurse sick calls and provided medication.  (Doc. No. 13-1, p. 14.)  Plaintiff also

states that he had been seen several times by medical staff, naming Nurses Tamara and Marsha,

who Plaintiff claims were dismissive of his respiratory symptoms, though Plaintiff acknowledges

that they had conducted examinations on Plaintiff and determined that his oxygen levels were

"good" despite Plaintiff's complaints.  *Id*. at 31.  Meanwhile, Plaintiff contends that his condition

continued to worsen and that he experienced symptoms including respiratory distress, "cold

shivers/shakings," "violent vomiting," "excruciating" pains in his kidney or abdominal areas,

muscle spasms and cramping, the inability to eat or smell food and drink fluids, weight loss, high

blood pressure, and the inability to stand or sit up for "long [] periods of time."  (Doc. No. 13,

pp. 29-30.)  Nevertheless, on May 11, 2021, Plaintiff claims that Dr. Cano examined him on May

11, 2021, and "determined at that time that [there was] no further necessity for follow up medical

treatment, examination or off site hospitalization was needed or required."  *Id*. at 31.

Plaintiff alleges that, on or about May 13, 2021, at 6:45 a.m., a correctional officer named

Garcia contacted the medical infirmary department, connecting with Nurse Marsha, to seek

medical treatment for Plaintiff.  (Doc. No. 13, p. 34.)  Nurse Marsha allegedly stated that she was

passing medications in other dorms and that she would "get around to Plaintiff whenever she

gets to [his] dorm to pass out medication [] and [] this was not an emergency matter."  *Id*.

Plaintiff states that Nurse Marsha did not arrive until about 9:00 a.m., and that Nurse Marsha was

"being very rude, mean and sarcastic," exclaiming "that because of Plaintiff's outcry for medical

assistance at that time – that commissary was now going to be delayed for all the inmates in his

dorm," allegedly with the intent to "arouse" the other inmates against Plaintiff because of his

outcry for medical attention.  *Id*. at 34-35.  Nurse Marsha proceeded to check Plaintiff's vital

signs and oxygen levels, and "again stated that there was nothing wrong with Plaintiff and supposedly 'cleared' him again." *Id*. at 35.  Plaintiff alleges that he pleaded with Nurse Marsha for medication to temper his pains or to be sent to a hospital for emergency medical treatment. *Id*.  Plaintiff claims that, "[i]nstead of helping Plaintiff, Nurse Marsha acted as if Plaintiff was bothering her with his repeated request for help and emergency medical services."  *Id*.

Plaintiff states that he was placed in a van and transported from the McKenzie Annex to the main Nueces County Jail later that day – a destination he believes to have been "erroneous" because Plaintiff apparently believed that he should have been taken to an outside hospital.  At the main jail, Plaintiff was placed in medical segregation.  In medical segregation, he was assigned to a cell with another inmate, who Plaintiff claims was mentally challenged; the other inmate allegedly took or ate Plaintiff's meal trays "since Plaintiff was unable to eat or taste any foods due to his excruciating abdominal/stomach pains which eventually caused excessive and rapid weight loss."  (Doc. No. 1, pp. 7-8; Doc. No. 13, pp. 19, 35.)  Plaintiff was allegedly placed in the only two-man cell on the medical floor.  (Doc. No. 13, p. 19.)  Plaintiff complains that his living conditions were "super cold" and that there was no hot water running from the shower, and he blames his cellmate for the filthy and unsanitary state of their cell, particularly the area in and around the toilet, whose seat was allegedly "filthy with caked dry urine and covered with dirty/soaked toilet paper around toilet area."  *Id*. at 19, 35, 37.  Plaintiff also contends he was not allowed to leave his medical segregation cell in order to participate in recreation or access the inmate pay phone.  *Id*. at 18-19.

Plaintiff states that during this time he developed new symptoms, such as redness and swelling of his legs, feet, and stomach, and drainage of clear fluid from his swollen legs.  (Doc. No. 13, p. 36.)  He also allegedly became so weak that he was unable to get up from his bed and

to go to the restroom, consequently wetting the bed and soiling himself, and the correctional officers on duty would have to bring him a change of clothes.  *Id*.

"[O]n numerous occasions," Plaintiff used the emergency call button inside his cell to request medical assistance for the pain he was allegedly experiencing in his abdomen, chest, and lower back, and for his feverish symptoms and "violent" vomiting.  (Doc. No. 13, pp. 18-19, 37.) Jail staffers would respond each time and would contact medical personnel, *see* Doc. No. 13, pp. 20, 37, but Plaintiff claims that "most times, if not always" medical personnel would have a "delay[ed]" response to his emergency calls, did not have the knowledge to treat Plaintiff's medical symptoms, and did not provide what Plaintiff terms "appropriate" medication.  *Id*. at 20, 37, 39.  Plaintiff also claims that, on some occasions during the medication "pass" rounds, where medical staff would distribute prisoners' medications, certain medical staff, namely Nurses Tina and Betty, would "get angry" and "cuss" at Plaintiff for his inability to get out of his bed to receive his medication and neglect Plaintiff's pleas for help.  *Id*. at 38.

Plaintiff states that he met with Dr. Cano on May 18, 2021, and requested to be transferred to a hospital to receive adequate medical care.  (Doc. No. 13, p. 40.)  Dr. Cano allegedly responded that "his hands were ti[ed]"—that he did not have the authority to approve a transfer.  *Id*.  Plaintiff claims that Dr. Cano also said he was unable to diagnose Plaintiff's symptoms and that he failed to prescribe the medication necessary to treat Plaintiff's symptoms. *Id*. at 38, 40; *see also* Doc. No. 13-1, p. 16 (stating, in an inmate communication form dated May 22, 2021, that prison officials were giving Plaintiff "by force" the same medications that he "should not be on" after administering a blood test on May 9).

Plaintiff also claims that Nurse Jennifer tried to help Plaintiff but that she was unable to understand his symptoms or help him and that she did not make any recommendation to get

Plaintiff transferred to a medical facility.  (Doc. No. 13, p. 41.)  Because Plaintiff was "without adequate medical treatment," he allegedly sought the help of his friends and relatives, whom he claims were denied access to Plaintiff "by Nueces County Jail administration or by the personal office of Sheriff J. Hooper, by and through his personal office manager/secretary."  (Doc. No. 1, p. 8; Doc. No. 13, p. 21; Doc. No. 13-1, pp. 32-33.)

Plaintiff claims that he "began to slip in and out of unconsciousness" in the days before he was transported to Spohn Hospital.  (Doc. No. 13, p. 40.)  On May 25, 2021, more than two weeks after Plaintiff allegedly started exhibiting symptoms, he was transported in a van driven by Deputy Matthew to Spohn Hospital.[3]  (Doc. No. 1, p. 8; Doc. No. 13, p. 41.)  Plaintiff states that he recalls telling Deputy Matthew that he "could not stand up anymore or walk due to his extreme/excruciating pains in the abdomen/stomach area" and that Deputy Matthew "grabbed Plaintiff's arm to assist Plaintiff . . . to the transport garage area where Plaintiff was loaded/placed [in] the transport van."  (Doc. No. 13, p. 40-41.)  Plaintiff claims that he was "denied" an ambulance "by the County Jail medical doctor and the healthcare provider contractor [Armor]" and subjected to no air conditioning or air circulation while confined in the transport van, allegedly exacerbating Plaintiff's pain, and causing Plaintiff to suffocate, hyperventilate, and sweat because of the heat.  (Doc. No. 1, p. 8.)  Plaintiff alleges that Deputy Matthew ignored and denied Plaintiff's requests "to turn on the air (A/C)."   (Doc. No. 13, p. 42.)

Upon arriving at the hospital, Plaintiff states that Deputy Matthew ordered Plaintiff to exit the van and forced him to walk into the emergency room, despite Plaintiff's pleas for a wheelchair because he was unable to walk or stand up straight due to his pain and swelling.

---

[3]  The undersigned takes judicial notice of the fact that the Nueces County Jail is less than two miles from Spohn Hospital.  *See* GOOGLE MAPS, https://maps.app.goo.gl/ePeUqz5rdCHvFG7S7 (last visited Dec. 13, 2023); *see also Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 610 n.15 (S.D. Tex. 2014) (taking judicial notice of geographic distance); *United States v. Cardona*, 524 F. Supp. 45, 47 (W.D. Tex. 1981) (same).

(Doc. No. 13, p. 42.)  Deputy Matthew "then grabbed Plaintiff [by] his arm (at some point) and practically forced/compelled [] Plaintiff to walk towards the building entrance." *Id*. at 42-43. Plaintiff claims he continued to plead with Deputy Matthew to find him help, a wheelchair, or a hospital bed, but that Deputy Matthew ordered Plaintiff to walk and "again . . . grabbed Plaintiff's arm to drag" him inside and down the hallway. *Id*. at 43.  Plaintiff alleges that he collapsed twice: once upon entry into the hospital, which subsequently allegedly resulted in Deputy Matthew grabbing Plaintiff by the arm again to "drag/pull him" down a hallway, and once upon a hospital bed, before being placed into a wheelchair.  (Doc. No. 1, p. 9; Doc. No. 13, p. 43.)

Plaintiff states that a  "hospital orderly . . . notice[d] [Plaintiff's] situation and quickly volunteered to get a wheelchair—which [Deputy Matthew] consented to."  (Doc. No. 13, p. 43.) Plaintiff was then allegedly situated into the wheelchair with the help of the orderly and Deputy Matthew, and Deputy Matthew pushed Plaintiff to the E.R. area of the hospital.  *Id*. at 44.  Once there, Plaintiff states that he was "promptly placed" in a hospital bed, subsequently relocated to another hospital floor, and then placed in intensive care.  *Id*.  At the hospital, doctors allegedly diagnosed Plaintiff with an E. coli infection, which Plaintiff states affected his spleen and liver and caused blood clotting, including in his liver, and they treated Plaintiff with antibiotics.  (Doc. No. 1, p. 9; Doc. No. 13, pp. 44-45.)  The doctors at the hospital told Plaintiff that his case was a "rare occurrence and invasion of the E. coli bacteria on the liver/spleen organs was unheard of and rare medical case."  (Doc. No. 13, p. 45.)

### ii.  Post-hospitalization.

On June 4, 2021, Plaintiff was allegedly "premature[ly]" cleared for release from Spohn Hospital and returned to the Nueces County Jail, where he was placed in a one-man medical

segregation cell.  (Doc. No. 1, p. 9; Doc. No. 14, p. 3.)  As part of his post-hospitalization treatment plan, Plaintiff claims he was prescribed seven or eight different medications, but that Nueces County Jail medical staff delayed giving Plaintiff his medications each night, as an apparent result of not conducting the P.M. medication pass rounds until the "late night evenings."[4]  (Doc. No. 13, p. 46.)  Such delay allegedly led Plaintiff to experience symptoms of nausea and vomiting.  *Id*.; Doc. No. 14, p. 4.  Plaintiff also purportedly continued to suffer from swelling and pain that arose from his illness, as well as respiratory distress.  (Doc. No. 1, p. 9; Doc. No. 14, p. 3.)  Plaintiff states that he sought medical attention and received treatment soon after returning from the hospital, including an inhaler, but that his requests to be transferred back to Spohn Hospital were denied.  (Doc. No. 14, p. 5; *see also* Doc. No. 14-2.)

On or around June 14, 2021, Plaintiff claims to have received an x-ray examination of his left side chest.  (Doc. No. 14, p. 5.)  However, the x-ray "[was] of no help" to Plaintiff, and Dr. Cano allegedly did not even know about the x-ray until Plaintiff asked about its results on a subsequent medical office visit in July 2021.  *Id*.  On July 8, 2021, Plaintiff claims to have received another x-ray examination of his left side chest, as well as a magnetic resonance imaging (MRI), allegedly showing "liquid was in Plaintiff's left lung," which Plaintiff claims was a sign of "[pneu]monia."[5]  *Id*. at 6.  Dr. Cano allegedly told Plaintiff that "this [pneumonia] problem may have been the cause of . . . [Plaintiff's] respiratory distress dating back to the beginning of 2021," which was "apparently" not detected by medical staff at the Nueces County

---

[4]  Plaintiff does not name any specific defendant who was responsible for this alleged delay when describing this incident.  However, elsewhere in his response to the Court's questionnaire, Plaintiff accuses Nurse Evonne of hindering Plaintiff's timely receipt of the medications.  (Doc. No. 13, p. 6.)  The undersigned liberally construes Plaintiff's claim of delay as being directed against Nurse Evonne.

[5]  In his response, Plaintiff states that the MRI showed "symptoms of ammonia."  (Doc. No. 14, p. 6.)  Given Plaintiff's stated symptoms of respiratory distress and liquid-filled lungs, Plaintiff apparently intended to assert that he had "pneumonia;" the Court addresses Plaintiff's pneumonia claims accordingly.

Jail or at the McKenzie Annex. *Id*. Despite Plaintiff's purported pneumonia symptoms, Dr. Cano allegedly denied Plaintiff's requests for treatment, explaining that "no medication" would be "required or necessary." *Id*.

Plaintiff states that his pain and symptoms continued to worsen while confined in the Nueces County Jail (Doc. No. 14, p. 7), and has provided the Court with copies of 12 written requests to prison officials, variously dated from June 7, 2021, through October 18, 2022, complaining of side effects from medication prescribed to treat his above-described illness, high blood pressure, lower back pain, fatigue, headaches, respiratory issues, and swelling and itching of his legs. (Doc. No. 14-2, pp. 2-13.) Plaintiff's submitted documents contain responses from medical personnel to ten of those requests, indicating that Plaintiff was referred or scheduled to be seen by medical providers, *id*. at 2-3, 6, 7, 10, instructions and notes regarding Plaintiff's medication, *id*. at 9, 11, 12, or that Plaintiff's issue had been addressed, *id*. at 13. Plaintiff does not state how long he remained in medical segregation post-hospitalization.

Apparently for purposes of comparison, Plaintiff states that he only began to improve upon transfer to TDCJ-CID's LeBlanc Unit in November 2022, after his guilty plea. (Doc. No. 14, p. 7.) Plaintiff alleges that, soon after arrival to the LeBlanc Unit, he was prescribed compression socks and medication to help with the swelling in his legs, medication to manage his high blood pressure, and skin creams for his leg discomfort and skin rashes. *Id*. at 8. Plaintiff states that he was also diagnosed with "congest[ive] heart failure" and that he was referred to a heart specialist at John Sealy Hospital in Galveston, Texas. *Id*.

### 3.  *Plaintiff's legal claims.*

Liberally construed, Plaintiff's § 1983 complaint lodges numerous claims against Defendants under the First, Eighth, and Fourteenth Amendments to the Constitution.  Plaintiff alleges that:

- Nueces County and Armor, as either actual or deemed municipal entities, acted with deliberate indifference to Plaintiff's serious medical needs and unconstitutionally denied him adequate medical care through their implementation, ratification, and enforcement of "*de facto* policies" and for their failure to adopt policies to provide appropriate medical treatment for inmates, failure to properly train medical personnel, and failure to investigate or discipline medical employees who were reported or found to have ignored inmates' medical needs (Doc. No. 1, pp. 3, 10, 11, 13-14, 16; Doc. No. 13, p. 3; Doc. No. 14, pp. 25-28);

- Sheriff Hooper, in his official and individual capacities, acted with deliberate indifference to Plaintiff's serious medical needs by virtue of the denial to Plaintiff of emergency medical transport to an offsite medical provider by prison healthcare employees (Doc. No. 1, pp. 10-12; Doc. No. 13, p. 15);

- Armor employees in their individual capacities – Dr. Cano, PA Steve, and Nurses Barbara, Thelma, Marsha, Tamara, Evonne, Tina, Betty, and Jennifer (collectively, the "Armor Individual Defendants") – acted with deliberate indifference to Plaintiff's serious medical needs by denying him emergency medical transport to an offsite medical provider, and also conspired to violate Plaintiff's constitutional rights (Doc. No. 1, pp. 3, 6-7; Doc. No. 13, pp. 4-8, 17);

- Nurse Marsha, in her individual capacity, retaliated against Plaintiff for complaining that she allegedly refused him proper medical treatment, by fabricating allegations about Plaintiff which resulted in his transfer to the Nueces County Jail from the McKenzie Annex and placement in "segregation" for 23 hours each day (Doc. No. 13, pp. 7, 25-26);

- Deputy Matthew, in his individual capacity, acted with deliberate indifference to Plaintiff's serious medical needs and also subjected Plaintiff to excessive force and cruel and unusual punishment when driving Plaintiff to Spohn Hospital (Doc. No. 1, pp. 3-7; *see also* Doc. No. 13, pp. 15-16, 40-43); and

- Nueces County breached its duty under 37 Tex. Admin. Code § 273.2 to provide "procedures 'for efficient and prompt care for acute and emergency situations' that arise in its county jail" and violated the Texas Tort Claims Act (TTCA)[6] for Plaintiff's personal injuries resulting from his denial of adequate medical treatment (Doc. No. 1, p. 10, 16; Doc. No. 13, p. 11).

### 4.  Plaintiff's requested relief.

As relief, Plaintiff seeks unspecified compensatory and punitive damages, expenses and costs, including attorneys' fees, and prejudgment and post-judgment interest.  He also seeks a declaratory judgment that the acts and practices complained of are in violation of federal law and "any other legal and equitable relief the Court deems just and proper."  (Doc. No. 1, p. 7.)

### C.  Standards of review.

### 1.  28 U.S.C. § 1915.

When a prisoner seeks to proceed *in forma pauperis*, the court shall "screen" the complaint – that is, the court is to evaluate the complaint and dismiss it without service of

---

[6]  Tex. Civ. Prac. & Rem. Code § 101.

process if the court finds the complaint frivolous, malicious, fails to state a claim upon which

relief can be granted, or seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A; *see* 28 U.S.C. § 1915(e)(2)(B) (providing that a court shall review an *in*

*forma pauperis* complaint as soon as practicable and dismiss it if it is frivolous or malicious, fails

to state a claim upon which relief may be granted, or seeks monetary relief from an immune

defendant).  A claim is frivolous if it has no arguable basis in law or fact.  *Neitzke v. Williams,*

490 U.S. 319, 328-29 (1989).  A claim has no arguable basis in law if it is based on an

indisputably meritless legal theory, "such as if the complaint alleges the violation of a legal

interest which clearly does not exist."  *Davis v. Scott,* 157 F.3d 1003, 1005 (5th Cir. 1998)

(citations omitted).  A claim has no arguable basis in fact if "after providing the plaintiff the

opportunity to present additional facts when necessary, the facts alleged are clearly baseless."

*Talib v. Gilley,* 138 F.3d 211, 213 (5th Cir. 1998) (citing *Denton v. Hernandez*, 504 U.S. 25, 32-

33 (1992)).

   "In analyzing the complaint, [the court] will accept all well-pleaded facts as true, viewing

them in the light most favorable to the plaintiff."[7]  *Jones v. Greninger,* 188 F.3d 322, 324 (5th

Cir. 1999) (*per curiam*).  "The issue is not whether the plaintiff will ultimately prevail, but

whether he is entitled to offer evidence to support his claim."  *Id.* (citations omitted).  Thus,

---

[7]  Plaintiff has attached exhibits of inmate communication forms detailing his medical care and symptoms to his complaint.  The Federal Rules of Civil Procedure provide that an attachment to a complaint generally becomes "part of the pleading for all purposes."  Fed. R. Civ. P. 10(c).  "Rule 10(c) therefore prohibits the Court's ignoring exhibits attached to a complaint."  *Merisier v. Johnson Cnty., Tex.*, No. 3:19-CV-2911-X-BN, 2021 WL 681443, at *11 (N.D. Tex. Jan. 14, 2021), *adopted*, 2021 WL 674123 (N.D. Tex. Feb. 22, 2021) (citing *Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019)).  "When 'an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls.'"  *Rogers v. City of Yoakum*, 660 F. App'x 279, 285 n.6 (5th Cir. 2016) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004)); *see also Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940).  Thus, the undersigned considers Plaintiff's exhibits part of his pleadings and will analyze Plaintiff's allegations, and address any discrepancies between the complaint itself and the exhibits, accordingly.

dismissal is inappropriate "unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must allege sufficient facts in support of his legal conclusions that give rise to a reasonable inference that Defendants are liable. *Id.*; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The factual allegations must raise Plaintiff's claim for relief above the level of mere speculation. *Twombly*, 550 U.S. at 555. If the complaint, taken as a whole, gives rise to a plausible inference of actionable conduct, Plaintiff's claim should not be dismissed. *Id.*

Pleadings filed by *pro se* litigants like Plaintiff are construed using a less stringent standard of review. Documents filed by *pro se* litigants are to be liberally construed, and *pro se* complaints, however inartfully drafted they might be, are held to less stringent standards than formal pleadings drafted by lawyers. *See Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff's well-pleaded factual allegations in the complaint are to be taken as true for purposes of screening, but such deference does not extend to conclusory allegations, unwarranted factual inferences, or legal conclusions. *DeMarco v. Davis*, 914 F.3d 383, 386-87 (5th Cir. 2019).

### 2. *42 U.S.C. § 1983.*

Title 42, United States Code, section 1983, provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, a plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42

U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).  A defendant acts under color of state law

if he or she misuses or abuses official power and if there is a nexus between the victim, the

improper conduct, and the defendant's performance of official duties.  *Townsend v. Moya,* 291

F.3d 859, 861 (5th Cir. 2002) (*per curiam*).

### D.  Discussion.

#### 1.  Plaintiff's constitutional claims as a pretrial detainee should be analyzed only under the Fourteenth Amendment, not the Eighth Amendment.

Plaintiff has challenged Defendants' actions on both Eighth Amendment and Fourteenth

Amendment grounds.  Plaintiff was a pretrial detainee during the entire time of the alleged

circumstances that gave rise to the instant § 1983 action, and his constitutional rights therefore

"are found in the procedural and substantive due process guarantees of the Fourteenth

Amendment."  *Estate of Henson v. Wichita Cnty., Tex.*, 795 F.3d 456, 462 (5th Cir. 2015) (citing

*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1966) (*en banc*)); *Cadena v. El Paso

Cnty.*, 946 F.3d 717, 727 (5th Cir. 2020).  "The standard is the same as that for a prisoner under

the Eighth Amendment."  *Cadena*, 946 F.3d at 717 (citing *Garza v. City of Donna*, 922 F.3d 626,

634 (5th Cir. 2019).  A pretrial detainee may prove a constitutional violation in one of two ways:

by demonstrating an unconstitutional condition of confinement or by demonstrating an

unconstitutional episodic act or omission.  *Hare*, 74 F.3d at 644-45.  Because of Plaintiff's

pretrial detainee status at the time of all of the alleged constitutional violations, any separate

Eighth Amendment claims against any of the defendants should be dismissed.

Fourteenth Amendment claims in this setting can be generally differentiated as either

"conditions of confinement" claims or "episodic acts or omissions" claims.  A "conditions of

confinement" claim is a constitutional attack on general conditions, practices, rules or restrictions

of pretrial confinement.  *Flores v. Cnty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997).

It is generally the conditions themselves that constitute the harm, "for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (*en banc*).  Courts apply the test set forth in *Bell v. Wolfish* in conditions-of-confinement cases.  *Wichita Cnty.*, 795 F.3d at 463.  Under *Bell*, the question is "whether those conditions [about which the plaintiff complains] amount to punishment of the detainee."  441 U.S. 520, 535 (1979).  "If an act is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"  *Id*. at 539.  Sometimes challenged conditions are explicit, and sometimes they reflect an unstated (*de facto*) policy "established by evidence of a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials to prove an intended condition or practice.'"  *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Hare*, 74 F.3d at 645).  But "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate."  *Id*.

"More often, however, a plaintiff's claim, properly characterized, faults specific jail officials for their acts or omissions because the plaintiff cannot establish the existence of an officially sanctioned unlawful condition."  *Brown v. Bolin*, 500 F. App'x 309, 313 (5th Cir. 2012).  "In these cases, 'an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.'"  *Id*. (quoting *Scott*, 114 F.3d at 53).  Thus, the plaintiff complains first of a certain act or omission and then "derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission.'"  *Wichita Cnty.*, 795 F.3d at 463 (quoting *Scott*, 114 F.3d at 53).  Intentionality is not presumed for episodic acts

or omissions claims, and a jail official violates the pretrial detainee's constitutional rights "when the official had 'subjective knowledge of a substantial risk of serious harm' to the detainee and responded to that risk with deliberate indifference." *Id.* at 464 (quoting *Hare*, 74 F.3d at 650). "In other words, the state official must know of and disregard an excessive risk to inmate health and safety." *Id.*

In *Brown v. Bolin*, the Fifth Circuit determined that the district court correctly analyzed the plaintiff's complaint under the episodic acts or omissions standard because the claim began with a nurse's determination that the plaintiff's medical condition could be handled by the jail, despite Plaintiff alleging the nurse's conduct was a result of a policy and the record lacked evidence of a "systemic failure of medical care of the type that we have found to present a[n] unconstitutional condition of confinement." *Brown*, 500 F. App'x at 313.

In *Estate of Henson v. Wichita County*, the Fifth Circuit determined that claims against a supervising physician who the plaintiffs claimed acted with deliberate indifference in failing to provide appropriate medical evaluation or transport for the detainee, who ultimately died in custody, were "properly characterized . . . as attacking episodic acts or omissions rather than conditions of [the detainee's] confinement." *Wichita Cnty.*, 795 F.3d at 464-65. The court further explained that, even if construed the plaintiffs' allegations as a challenge against a condition of confinement, the plaintiffs failed to show that the acts or omissions "were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice" that would "base a constitutional claim on the defendant's implementation of an unstated rule or policy." *Id.* at 465 (internal citations omitted).

Here, Plaintiff does not specify which theory of liability he intends to pursue (and indeed he is not required to make any such election). Plaintiff's claims stem from the alleged denial of adequate medical care and treatment by prison officials, and most of Plaintiff's claims center on Defendants' actions, that Defendants were deliberately indifferent to Plaintiff's serious medical needs and that he was denied adequate medical care—language that mirrors episodic acts or omissions claims. However, applying the mandate to liberally construe Plaintiff's allegations, the undersigned considers Plaintiff's allegations under both theories for screening purposes where such a distinction can be made.

### 2. Plaintiff's claims against Nueces County and Armor fail to state a plausible claim for municipal liability under § 1983 and, therefore, should be dismissed.

Plaintiff asserts that Nueces County's contract with Armor and the ratification of their alleged unconstitutional "de facto polic[ies]," denied Plaintiff adequate medical treatment during his detention as a pretrial detainee at the Nueces County Jail. (Doc. No. 1, pp. 3, 10, 13-14, 16; Doc. No. 13, p. 3; Doc. No. 14, pp. 25-28.) Specifically, Plaintiff alleges the existence of three "unconstitutional" policies promulgated and enforced by Nueces County, Armor, and Sheriff Hooper: a "cost containment policy;" a "medical segregation policy;" and a "transport van policy." (Doc. No. 13, pp. 15-23; Doc. No. 14, p. 28.) Plaintiff alleges that these policies were the "moving force and causation behind Plaintiff's deprivation of his constitutional rights to adequate medical care, emergency medical treatment[,] and prompt transfer/transport to [an] offsite medical facility," and resulting in Defendants' deliberate indifference to Plaintiff's serious medical needs. (Doc. No. 13, p. 18.)

Plaintiff also sues Armor,[8] alleging that Armor acted with deliberate indifference to Plaintiff's medical needs by failing to adequately train its employees.  Plaintiff also claims that Armor deliberately discriminated against Plaintiff because Armor allegedly provided "different [medical] treatment [compared to] other similarly situated inmates with serious medical needs." (Doc. No. 14, p. 25.)  Plaintiff also seeks to hold Armor vicariously responsible for the Armor Individual Defendants' alleged "conspiracy" to deprive Plaintiff of his right to constitutionally adequate medical care.  *Id.*

### a. Law.

Under § 1983, a municipality such as Nueces County may only be held liable for acts for which it is actually responsible.  *See Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  The governmental body must either itself subject a person to a deprivation of rights or cause a person to be subjected to such deprivation.  *Connick v. Thompson*, 563 U.S. 51, 59 (2011).  A municipality is liable for the constitutional violations of its employees only if the alleged constitutional deprivations resulted from municipal policy or custom.  *Monell*, 436 U.S. at 694; *see also Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (a municipality may not be subject to liability merely for employing a tortfeasor; liability requires deliberate

---

[8]  Plaintiff purports to sue Armor in its "individual" capacity.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the seminal case establishing governmental accountability for unconstitutional acts under § 1983, did not address "official" or "individual" capacities in its holding.  The case held only that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691.  The Fifth Circuit has treated the question of municipal liability as separate from the question of a private entity's capacity in the context of liability, stating in *Goodman v. Harris County*, "[c]laims under § 1983 may be brought against persons in their individual or official capacity, *or against a governmental entity*." 571 F.3d 388, 395 (5th Cir. 2009) (emphasis added).  Other courts have followed suit.  *See Marshall v. Webre*, No. 23-1319, 2023 WL 5956745, at *4 & n.55 (E.D. La. Sept. 13, 2023) (analyzing different approaches by district courts but ultimately concluding that these approaches, such as analyzing private entities' alleged constitutional violations in their individual capacities conflict with the Fifth Circuit's holding in *Goodman*). In the next section, the undersigned concludes that, for purposes of screening, Armor was performing a traditional governmental function with regard to all of the acts alleged by Plaintiff.  The undersigned will thus analyze Plaintiff's § 1983 claims against Armor under *Monell*'s rules for municipal liability.

action attributable to the municipality that is the direct cause of the alleged constitutional violation).  An official municipal policy "includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 60.

Liability of a municipality under § 1983 therefore requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom.  *Monell*, 436 U.S. at 694; *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).  "[I]solated unconstitutional actions by municipal employees will almost never trigger liability," because "the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur."  *Piotrowski*, 237 F.3d at 578. "Importantly, to adequately plead a policy or custom, the specific policy must be identified; it may not be inferred 'merely because harm resulted from some interaction with a governmental entity.'"  *Kibbey v. Collin Cnty. Detention Facility*, No. 4:21-CV-799, 2023 WL 2598666, at *3 (E.D. Tex. Mar. 1, 2023), *adopted*, 2023 WL 2593152 (E.D. Tex. Mar. 20, 2023) (quoting *Guillotte v. Knowlin*, Civ. No. 21-1422, 2021 WL 7632004, at *2 (E.D. La. Dec. 7, 2021) (internal citation and quotation marks omitted)).  "[B]oiler plate allegations of municipal policy, entirely lacking in any factual support that a municipal policy does exist, are insufficient." *Rodriguez v. Southern Health Partners, Inc.*, No. 3:20-CV-0045-D, 2020 WL 2928486, at *5 (N.D. Tex. June 3, 2020) (citations omitted).

Courts construe the identity of the final policymaker as "a question of law—specifically a question of state law—and not a question of fact." *Groden v. City of Dallas, Tex.*, 826 F.3d 280, 284 (5th Cir. 2016) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("We begin by reiterating that the identification of policymaking officials is a question of state law.")).  "[I]t

has long been recognized that, in Texas, the county Sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Turner v. Upton Cnty., Tex.*, 915 F.2d 133, 136 (5th Cir. 1990) (citing *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)). Where the care of inmates is concerned, state law specifically provides that "[t]he sheriff of each county is the keeper of the county jail." Tex. Loc. Gov't Code § 351.041(a). As such, a county sheriff is required to "safely keep all prisoners committed to the jail by a lawful authority, subject to an order of the proper court." *Id.* Plaintiff has identified Sheriff Hooper as policymaker. (Doc. No. 1, p. 12; Doc. No. 13, p. 15.)

Armor is a private corporation that allegedly contracted with Nueces County to provide medical care in its jails. As noted above, one of the elements to successfully state a claim under § 1983 requires that the defendant must have acted under color of state law. *See* 42 U.S.C. § 1983; *West*, 487 U.S. at 48. "Where the defendants are private entities or actors, state action can be found where the entity or person performs a function that is traditionally the exclusive province of the state or where there is a nexus between the state and the private defendant's action 'such that the action is fairly attributable to the state.'" *Agoh v. Hyatt Corp.*, 992 F. Supp. 2d 722, 741 (S.D. Tex. 2014) (Harmon, J.) (quoting *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989), *overruled on other grounds*, *Arana v. Ochsner Health Plan*, 338 F.3d 433, 440 (5th Cir. 2003) (*en banc*)). Courts have long held that private entities providing medical services to prisoners are performing a traditional state function and, therefore, can be considered state actors subject to liability under § 1983 with respect to those services. *See West*, 487 U.S. at 54-57; *Sanchez v. Oliver*, 995 F.3d 461, 466 (5th Cir. 2021) ("[T]here is no question that [defendant], a medical professional treating a pretrial detainee on behalf of a governmental entity, was acting

under color of state law for purposes of § 1983.").  "The requirement of a policymaker, an official policy, and the 'moving force' of the policy, serve to distinguish individual violations by government healthcare contractor employees from those that can be fairly considered actions of the government health contractor itself."  *Woodward v. Lopinto*, Civ. No. 18-4236, 20221 WL 1969446, at *5 (E.D. La. May 17, 2021) (citing *Piotrowski*, 237 F.3d at 578).  Therefore, to support a § 1983 claim against a private entity like Armor, Plaintiff must allege facts to support that his constitutional rights were violated as a result of a policy, decision, or custom promulgated or endorsed by Armor.  *See Bd. of County Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

### b.  The alleged policies.

#### i.  The "cost containment" policy.

The first purported policy Plaintiff claims violated his constitutional rights—the "cost containment policy"— was allegedly a *de facto* stipulation in Nueces County's contract with Armor, to reduce costs for inmate health care by only allowing emergency medical treatment and transport to outside medical facilities for inmates facing "life or death" situations and preventing medical staff from approving emergency medical treatment and transport for other serious medical needs.  *See* Doc. No. 13, pp. 15-17.  Plaintiff alleges that only Nurse Barbara was vested with the decision-making authority to approve emergency medical care and transport, and that Sheriff Hooper was "fully aware" of the "cost containment" stipulation in the contract between Nueces County and Armor.  *Id*. at 16-17.  Plaintiff cites this policy as the reason for his delayed emergency transport to the hospital.

Plaintiff, however, fails to plausibly allege a causal factual link between the purported cost containment policy and any constitutional violation.  He alleges that Nueces County or

Armor have a financial policy to avoid providing off-site emergency medical care for prisoners, and then leaps ahead to the conclusion that the alleged delay or denial of his off-site care was the result of that policy.  What Plaintiff fails to allege is that any medical provider actually found that off-site emergency care was medically necessary, but that such care was then thwarted by the purported cost containment policy.  In other words, Plaintiff does not allege (much less plausibly allege) that Nurse Barbara, supposedly the only person permitted to authorize off-site medical treatment, relied on the supposed cost containment policy to deny any request by Dr. Cano to allow Plaintiff to receive off-site medical care despite a finding by Dr. Cano that such off-site care was medically necessary – indeed, Plaintiff does not allege that Dr. Cano ever made any such finding of medical necessity or made any such request for off-site treatment, or that Nurse Barbara countermanded that finding based on the cost containment policy.  Rather, Plaintiff alleges exactly the opposite: he claims that Dr. Cano examined him on May 11 and "determined at that time that [there was] no further necessity for follow up medical treatment, examination or off site hospitalization was needed or required."  (Doc. No. 13, p. 31.)  And later, on May 18, when Plaintiff requested that Dr. Cano transfer him to a hospital for offsite medical treatment, Plaintiff alleges only that Dr. Cano responded that he did not have the authority to approve a transfer.  Despite Dr. Cano's alleged "hands [being] ti[ed]," Plaintiff does not allege that Dr. Cano ever made any medical judgment that off-site care was necessary or that Nurse Barbara or anyone else then denied such care based on the supposed cost containment policy.  *See id.* at 40.  Because Plaintiff fails to plausibly articulate a causal link between the purported policy and any constitutional violation he allegedly suffered,[9] his *Monell* allegation based on the so-called cost containment policy fails to state a claim and should be dismissed.

---

[9]  Plaintiff does not allege that he has a constitutional right to health care that is not medically necessary.

### ii. The "medical segregation" policy.

The second purported policy Plaintiff identifies—the "medical segregation policy"—allegedly dictated that Plaintiff be left in medical segregation for "indefinite lengths of time" without adequate medical care.  (Doc. No. 1, pp. 10-12; Doc. No. 13, pp. 18-20.)

Plaintiff appears to fault Sheriff Hooper, individually, for his "medical segregation," but also states "or in conjunction with [Armor], implemented/promulgated/adopted the policy, practice or custom of placing inmates/detainees (including Plaintiff) with serious medical needs in medical segregation cells without adequate medical care, attention, medication(s) or emergency medical treatment and/or prompt transport to [an] offsite medical facility."  (Doc. No. 13, p. 18.)  The undersigned liberally construes Plaintiff's "or in conjunction with" clause as an official capacity claim relating to municipal liability, because of his allegations of promulgating a policy of inadequate medical care in relation to medical segregation.  The undersigned also addresses Plaintiff's individual capacity claim against Sheriff Hooper below.

Plaintiff claims that he was placed in medical segregation from May 13, 2021, until his transfer to Spohn Hospital on May 25, 2021.  (Doc. No. 13, p. 18.)  Plaintiff alleges that he was placed in the only two-man cell on the medical floor and that he was placed with a "mentally challenged" inmate, where Plaintiff was subjected to cold, unsanitary, and filthy living conditions and no hot running water from the shower.  (Doc. No. 1, pp. 7-8; Doc. No. 13, pp. 19, 35.)  He also alleges that his cellmate stole his food.  (Doc. No. 13, pp. 19, 35, 37.)  Plaintiff also states that he "pressed the emergency button on numerous occasions," requesting medical assistance for his symptoms, and that the process "repeated itself each day" until his transfer to Spohn Hospital.  *Id*. at 19.

Plaintiff's claim regarding Nueces County and Armor's purported "medical segregation policy" lacks sufficient factual allegations to create the necessary link between the purported policy and any violation of Plaintiff's constitutional rights in segregation.  As discussed next, he fails to plausibly allege that his treatment in medical segregation was required or impelled by the alleged policy.

Here, Plaintiff states that there exists a "medical segregation policy" but does not allege any facts about this policy in relation to the medical segregation he allegedly experienced.  Plaintiff does not claim that there is a written policy requiring that inmates be left in medical segregation for indefinite lengths of time and be denied necessary medical care.  Nor does he allege any facts indicating how any policy itself, as written, violated his rights or served as the moving force behind any violation of his rights.  Moreover, Plaintiff does not offer any pattern of deficiencies.  Thus, Plaintiff fails to plausibly allege that there was a widespread practice of "medical segregation" that was so common and well-settled as to constitute a custom that fairly represented municipal policy.[10]

An analogous situation arose in *Rodriguez v. Southern Health Partners, Inc*. ("SHP") ("*Rodriguez I*").  There, plaintiff Rodriguez alleged, in her first amended complaint, that the reason she was denied proper prenatal care was because SHP and Navarro County policy "refused to send anyone to the hospital unless there was a manifest emergency . . . and that inmates with serious medical conditions that require more than limited nursing care are not allowed to seek more advanced care at a hospital to prevent dangerous medical events before they happen."  *Rodriguez I*, 2020 WL 2928486, at *5 (internal quotations omitted).  The court held that Rodriguez's "conclusory allegations [were] insufficient to support a reasonable

---

[10]  Plaintiff's complaints about allegedly deficient medical treatment are discussed further below, in the sections addressing deliberate indifference.

inference that either SHP or Navarro County actually had an official policy or custom of not allowing inmates to seek hospital treatment unless there was a medical emergency." *Id.* Later, in analyzing Rodriguez's second amended complaint, the same court found that Rodriguez failed to establish "'a pattern of abuses that transcends the error made in a single case.'" *Rodriguez v. Southern Health Partners, Inc.* (*"Rodriguez II"*), No. 3:20-CV-0045-D, 2020 WL 2928486, at *8 (N.D. Tex. Dec. 2, 2020) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 850-51 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 582)). "Because Rodriguez has not alleged any other instances of the Jail's denying emergency services," the court reasoned, "she has failed to plausibly plead that SHP and Navarro County had a policy or custom of not allowing inmates to seek treatment from a hospital or specialist, even when medical staff knew it was necessary and that the inmate was likely to suffer an emergency when there was no staff on site trained to recognize or treat it." *Id.*

Here, like in *Rodriguez*, Plaintiff does not allege the existence of any written medical segregation policy, and he fails to plausibly allege a *de facto* policy or custom of denying adequate medical care to jail inmates. Plaintiff's threadbare claim regarding the alleged medical segregation policy should therefore be dismissed.

### iii. The "transport van" policy.

The final policy Plaintiff assails is the alleged "transport van policy," an apparent offshoot of the purported cost containment policy. In the interest of saving money, Plaintiff claims, Armor maintained a *de facto* policy of denying emergency medical transport to off-site care facilities. (Doc. No. 13, p. 21.) Nueces County, through Sheriff Hooper, allegedly adopted or ratified this policy in the name of cost containment. *Id.*

Plaintiff's claims regarding delay or denial of off-site medical care itself, based on the cost containment policy, are discussed above.  To the extent that Plaintiff alleges that the cost containment policy's alleged limitation of off-site medical care also dictated the denial of ambulance transport to receive such care, the previous section's reasoning applies equally: Plaintiff fails to plausibly allege that Dr. Cano or any other medical provider found ambulance transportation to be medically necessary for Plaintiff, or that Nurse Barbara invoked the cost containment policy to deny such ambulance transportation to Plaintiff.

Liberally construed, Plaintiff's transport van policy claim may be aimed at the manner of his eventual transport for less than two miles from the Nueces County Jail to Spohn Hospital. This trip, he claims, caused him to overheat because there was no air conditioning in the van. (Doc. No. 13, pp. 21-23.)  Plaintiff fails to sufficiently plead any facts indicating that any "transport van" policy exists at all.  Unlike the cost containment policy, he does not claim that he was told about a transport van policy by Dr. Cano or anyone else.  He likewise does not allege that Armor maintains an explicit or *de facto* policy of requiring use of vans instead of ambulances in order to save money when transport to an off-site care location is necessary.  Nor does Plaintiff allege a widespread practice or custom related to overheated transport vans.  He claims merely that he was not taken to the hospital by ambulance but instead by van, and that his van to the hospital was too hot.  Like the plaintiff in *Rodriguez*, discussed above, Plaintiff fails to establish "a pattern of abuses that transcends the error made in a single case."  *Rodriguez II*, 2020 WL 2928486, at *8 (internal citations and quotations omitted).

Plaintiff also fails to allege that Dr. Cano or any other medical professional found that an ambulance was medically necessary as opposed to a transport van, or that Nurse Barbara or anyone else invoked the transport van policy to deny Plaintiff an ambulance and instead require

him to travel to his hospital in a transport van.  Finally, Plaintiff does not articulate why being

driven to the hospital in an allegedly hot transport van instead of an ambulance violated his

constitutional rights.  Plaintiff therefore fails to plausibly allege that the "transport van policy"

was the moving force behind any violation of his rights.

### iv. *Deliberate understaffing.*

Plaintiff contends that Armor "deliberately employ[ed] insufficient number of medical

care providers to meet the reasonable and necessary medical needs and treatment of

inmates/detainees (including the plaintiff) …."  (Doc. No. 1, p. 14.)  To the extent this allegation

can be construed as a claim that Armor maintained a policy of not employing enough medical

providers, the allegation fails to plausibly allege a viable claim.  To survive screening, Plaintiff

would need to plausibly allege that there was a policy, promulgated by Armor, of deliberate

indifference to the risk of understaffing and that this policy caused constitutional injury to

Plaintiff.  *See Humphrey v. Hall*, No. 1:19-cv-362, 2021 WL 8153615, at *6 (S.D. Miss. Nov. 1,

2021), *adopted as modified*, 2022 WL 902741 (S.D. Miss. Mar. 28, 2022), *aff'd*, No. 22-60227,

2023 WL 2706830 (5th Cir. Mar. 29, 2023).  "Evidence of understaffing would become proof of

an official policy only If more complete funding and staffing were possible and it was the

deliberate intent of the policy-making official not to adequately fund and staff the prison."  *Id.*

(citing *Gagne v. City of Galveston*, 671 F. Supp. 1130, 1135 (S.D. Tex. 1987), *aff'd*, 851 F.2d

359 (5th Cir. 1988)).

Here, Plaintiff alleges no non-conclusory facts that could plausibly indicate that Armor's

staffing levels at the Nueces County Jail were too low, much less that Armor deliberately

decided to engage in such understaffing.  Plaintiff fails to explain why Armor's staffing levels

caused him injury, or that those staffing levels prevented him from being seen by any medical

provider at the jail.  Plaintiff's complaint, rather, is that the care he received from those providers was not to his satisfaction.  Because Plaintiff fails to plausibly allege any viable claim regarding staffing, his claim in this regard should be dismissed.

### c. Failure to adopt appropriate policies.

Plaintiff briefly contends that Nueces County and Armor should be held liable for "deliberately failing to adopt or enforce county jail policies or procedures and encouraging … de facto policies…."  (Doc. No. 1, p. 11.)  Liberally construed, to the extent that Plaintiff's allegation is that Nueces County and Armor failed to adopt appropriate policies, Plaintiff fails to make a plausible claim.

Supervisory officials may be liable under § 1983 for their failure to adopt policies if that failure causally results in a constitutional injury.  *Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022).  But such liability arises only when the officials act, or fail to act, with deliberate indifference.  *See Monacelli v. City of Dallas*, No. 3:21-CV-02649, 2023 WL 6563410, at *10 (N.D. Tex. Sept. 1, 2023) (citing *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011)), *adopted*, 2023 WL 6370753 (N.D. Tex. Sept. 29, 2023).  A plaintiff must plausibly allege that the official had actual or constructive notice that his or her failure to adopt policies would result in constitutional violations, and such actual or constructive knowledge typically requires showing notice of a pattern of similar constitutional violations.  *Monacelli*, 2023 WL 65634310, at *10 (citing *Crittindon*, 37 F.4th at 186).

Here, Plaintiff alleges only that "numerous complaints and incident[s]" were reported or lodged regarding medical care against Nueces County, Sheriff Hooper, and Armor employees and staff by "numerous inmates/detainees (including the plaintiff) who have had their serious medical needs denied of adequate medical care/treatment …."  (Doc. No. 1, p. 11.)  Even though

Plaintiff asserts (without specific facts) that complaints were lodged, he does not plausibly claim that any of those complaints alleged constitutional violations, let alone a pattern of constitutional violations.  Nor does he plausibly allege that any of those complaints resulted in an actual finding of a constitutional violation, much less that any policymaker had actual or constructive notice that constitutional violations would ensue unless a policy were adopted.  Plaintiff's allegation in this regard is conclusory and should be dismissed.

### d. Failure to train.

Plaintiff also seeks to impose § 1983 liability upon Armor based on its alleged failure to train its employees.  (Doc. No. 1, pp. 11, 12.)  "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick*, 563 U.S. at 61.  However, a governmental entity's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id*.; *see also City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*.").  To establish *Monell* liability on a failure-to-train theory, a plaintiff must prove that (1) the entity or supervisor failed to train or supervise the subordinate official, (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights, and (3) the failure to train or supervise amounts to deliberate indifference.  *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381 (5th Cir. 2005).  The Supreme Court has emphasized that deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick*, 563 U.S. at 61 (quoting *Bryan Cnty.*, 520 U.S. at 410).  Thus, to succeed on a

claim of failure to train or supervise under § 1983, the plaintiff usually must demonstrate "a *pattern of violations*." *Estate of Davis ex rel. McCully*, 406 F.3d at 382 (quoting *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003) (internal quotations omitted) (emphasis in original). "Without notice that a course of training is deficient in any respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*  The focus is on the adequacy of the training program in relation to the tasks that particular employees must perform, and a plaintiff must allege with specificity how a particular training program is defective.  *See Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

In his pleadings, Plaintiff does not articulate any facts concerning how Armor employees were trained, why or how their training was deficient because of some failure by Armor, how any failure to train resulted in a violation of his constitutional rights, or how any failure to train amounts to deliberate indifference on Armor's part.  Plaintiff merely argues that Armor is liable under a failure to train theory because of Armor employees' allegedly deficient response to Plaintiff's medical needs.  Because Plaintiff fails to allege any non-conclusory facts (or indeed any facts at all) regarding any failure to train, his failure-to-train claim should be dismissed.

### e.  Failure to investigate or discipline.

Plaintiff claims that Armor deliberately failed to "investigate and/or discipline those persons (whether county or healthcare employees/staff) who have been reported by inmates/detainees (including the plaintiff) or found to have ignored the medical needs" of inmates or detainees."  (Doc. No. 1, p. 12.)  Plaintiff's claim is reducible to an assertion that grievances he may have filed against Armor or jail employees were not investigated or resolved to his satisfaction.  A prisoner does not have a constitutional right to a grievance procedure at all.  *Staples v. Keffer*, 419 F. App'x 461, 463 (5th Cir. 2011) (citing *Geiger v. Jowers*, 404 F.3d

371, 373-74 (5th Cir. 2005)).  And a prisoner certainly does not have any federally protected liberty interest in having grievances resolved to his or her satisfaction.  *See Geiger*, 404 F.3d at 374 (because "[plaintiff] does not have a federally protected liberty interest in having [his] grievances resolved to his satisfaction . . . any alleged due process violation arising from the alleged failure to investigate his grievances is indisputably meritless.").

By the same measure, Plaintiff's failure-to-discipline claim also falls short of a plausible allegation.  First, and most importantly, Plaintiff does not plausibly allege any facts indicating that any Armor employee was ever found to have ignored the medical needs of any prisoner or detainee.  Plaintiff's claim fails for this reason alone.  By extension, Plaintiff also fails to plausibly allege a pattern of such findings, and § 1983 liability for failure to discipline would be premised on Armor's deliberate indifference creating an atmosphere condoning or ratifying such behavior.  *Cf. Edwards v. City of Balch Springs, Tex.*, 70 F.4th 302, 313 (5th Cir. 2023) (plaintiff failed to establish pattern of similar constitutional violations to show deliberate indifference by municipality for allegedly failing to supervise or discipline).  Plaintiff's failure-to-investigate and failure-to-discipline claims should be dismissed.

### f.  *Negligent hiring.*

Plaintiff attempts to hold Nueces County and Armor liable for "deliberately failing to [hire] adequate and efficient train healthcare and county jail staff and/or hire trained healthcare and county personnel and/or adequately supervise and observe and handle critical/emergency medical situations stemming from the severe/serious medical needs/conditions of inmates/detainees (including the plaintiff)."  (Doc. No. 1, pp. 11-12.)  Plaintiff's negligent supervision claim is discussed above, and the undersigned recommends its dismissal.  So too with Plaintiff's negligent hiring claim.

To survive screening of his negligent hiring claim, Plaintiff must plausibly allege that Armor and Nueces County exhibited deliberate indifference to inmates' medical needs when making their hiring decisions. *See Hare*, 74 F.3d at 650. Plaintiff fails to make such a plausible allegation here: rather, his contention is merely that the Armor and jail employees failed to provide him with the appropriate care, either deliberately or because they were incapable of doing so. Plaintiff does not allege any facts indicating that either Nueces County or Armor were ever aware that they might be hiring incompetent employees, or that armed with that knowledge they pressed forward anyway. *Cf. Belcher v. Lopinto*, Civ. No. 18-7368, 2018 WL 5847822, at *2 (E.D. La. Nov. 8, 2018). Plaintiff's negligent hiring claim therefore is not viable, and it should be dismissed.

### g. *Vicarious liability.*

Plaintiff also alleges that Armor should be held vicariously liable for its employees' alleged constitutional violations, specifically the Armor Individual Defendants' alleged "conspiracy" in depriving Plaintiff of his right to constitutionally adequate medical care. In his pleadings, Plaintiff argues that a private corporation can be held liable for its employees' alleged constitutional violations under a theory of vicarious liability, or *respondeat superior*. *See* Doc. No. 14, pp. 12-23; *id*. at 16 ("The theory of respondeat superior liability is a viable doctrine affirmed by the Court").

Plaintiff acknowledges that the Fifth Circuit has "apparently, never squarely decided whether plaintiffs can hold *private* defendants vicariously liable under § 1983." (Doc. No. 14, p. 22 (quoting *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) (emphasis in original)). In *Moore*, the court had declined to consider the issue because it was being raised for

the first time on appeal and left "for another day whether plaintiffs can hold private defendants vicariously liable under § 1983."[11]  *Id.*

Outside of the Fifth Circuit, "'every circuit to consider the issue' has extended 'to private corporations as well' the rule that a defendant cannot be held liable under section 1983 on a respondeat superior or vicarious liability basis."  *Savoie v. Martin*, 673 F.3d 488 (6th Cir. 2012) (quoting *Street v. Corrections Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (collecting cases from the Fourth, Eighth, and Eleventh Circuits)); *see also Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014) (reaffirming that *respondeat superior* liability does not apply to private corporations under § 1983; "a private corporation [contracted to provide essential government services (healthcare for prisoners)] cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself").

District courts within the Fifth Circuit are divided on the issue.  While some courts have extended protections to private corporations performing government functions, *e.g.*, *Montgomery v. Logsdon*, No. 20-756, 2022 WL 4245542, at *3 (E.D. La. Apr. 25, 2022); *Porter v. Wilkinson*, No. 10-CV-506, 2010 WL 3325709, at *3 (W.D. La. Aug. 3, 2010), *adopted*, 2010 WL 3327934 (W.D. La. Aug. 23, 2010) ("[J]ust as a municipal corporation is not vicariously liable for the constitutional torts of its employees, a private corporation is not vicariously liable under 1983 for its employees' deprivations of others' civil rights."), other district courts have found that "[i]mposing liability on private corporations affects neither the state's police power nor its ability

---

[11]  The Fifth Circuit has stated, in an unpublished footnote that a "municipality cannot have § 1983 liability based on the doctrine of *respondeat superior*.  Further, [e]very circuit court to consider the issue has extended the holding to private corporations as well."  *Meade v. Dillard Dep't Stores*, 275 F.3d 43, 2001 WL 1223752, at *3 n.3 (5th Cir. 2001) (unpublished) (internal citations omitted) (citing *Monell*, 436 U.S. at 691; *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992) (collecting cases)).

to regulate its municipalities." *Hutchinson v. Brookshire Bros., Ltd.*, 284 F. Supp. 2d 459, 473 (E.D. Tex. 2003); *Belknap v. Leon Cnty., Tex.*, No. 6:22-CV-01028-ADA-JCM, 2023 WL 3604728, at *8 (W.D. Tex. Apr. 3, 2023), *adopted*, 2023 WL 3612345 (W.D. Tex. May 23, 2023) (recommending district court hold that private prison contractors can be held vicariously liable for constitutional violations committed by employees while acting within the course and scope of their employment).

Here, however, the Court need not resolve whether Armor can be held vicariously liable under § 1983 for its employees' conspiracy, because Plaintiff has not plausibly alleged that Armor's employees engaged in any "conspiracy." To state a conspiracy claim under § 1983, a plaintiff must allege both an agreement between a defendant and others, involving at least one person acting under color of state law, to commit an illegal act, and an actual deprivation of the plaintiff's constitutional rights in furtherance of that agreement. *See Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). Here, and as discussed further below, "Plaintiff's § 1983 conspiracy claim has a fatal flaw: the absence of any specific allegations of an agreement among the Acting Defendants." *See Wingard v. Louisiana through Dep't of Pub. Safety & Corrections*, 594 F. Supp. 3d 704, 719 (M.D. La. 2022). Plaintiff fails to allege any facts, let alone any non-conclusory facts, indicating such an agreement. Moreover, Plaintiff fails to plausibly allege that a constitutional violation occurred—which provides the underpinning for any claim of conspiracy. Accordingly, Plaintiff's *respondeat superior* "conspiracy" allegation against Armor fails to state a claim and should be dismissed.

### h. Discrimination.

Finally, Plaintiff states that Armor "purposefully discriminated against [him] and [he] received different treatment (or adequacy of medical treatment) [than] other similarly situated

inmates with serious medical needs in the Nueces County Jail and other related jurisdictions." (Doc. No. 14, p. 25.)  However, Plaintiff has alleged this "purposeful" discrimination only in terms of his claims of deliberate indifference purportedly exhibited by individual Armor employees to his serious medical needs.  He does not allege that Armor itself, as an entity, did anything to discriminate against him.  And as with his conspiracy claim, Plaintiff fails to plausibly allege any basis for Armor's vicarious liability for its employees' supposed discrimination: this is because, even when construed in the light most favorable to Plaintiff, Plaintiff's asserted facts fail to allege a viable cause of action of discrimination under § 1983.

Liberally construing Plaintiff's claim as an equal protection claim, Plaintiff's allegation that Armor or its employees deliberately discriminated against Plaintiff is conclusory.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Other than stating that only inmates "near death" are transported to the hospital, Plaintiff does not assert a specific instance in which any other inmate similarly situated to Plaintiff with serious medical needs received different or more favorable treatment than Plaintiff received.[12]  And even if Plaintiff had alleged a specific instance or instances of differing treatment compared to that of similarly situated inmates afflicted with serious medical needs in the jail, Plaintiff would also have to show "that an illegitimate animus or ill-will motivated [his] intentionally different treatment from others similarly situated and that no rational basis existed for such treatment."  *Shipp v. McMahon*, 234 F.3d 907, 916 (5th Cir. 2000), *overruled on other grounds by McClendon v. City of Columbia*, 305 F.3d 314 (5th Cir. 2002) (*en banc*).  In addition, "[d]iscriminatory purpose in an equal protection context implies that the decisionmaker selected a particular course of action at least in part because of, and not simply in spite of, the adverse impact it would have on an identifiable

---

[12]  Indeed, Plaintiff would be hard-pressed to identify such an inmate because he insists that Armor's *de facto* cost containment policy prevents any inmate from receiving the type of treatment that was allegedly denied Plaintiff.

group." *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992); *see also Burge v. Stalder*, 54 F. App'x 793, at *2 (5th Cir. 2002).  Here, Plaintiff alleges no specific conduct or statements by Armor or its employees expressing any discriminatory intent.  Accordingly, Plaintiff fails to state a claim upon which relief can be granted and his discrimination claim should be dismissed.

### 3.  Plaintiff's allegations against Sheriff Hooper in his official and individual capacities fail to state a claim.

Plaintiff sues Sheriff Hooper in his official and individual capacities.  Under § 1983, a suit against individuals in their official capacities "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent."  *Goodman*, 571 F.3d at 395 (internal quotations and citation omitted).  In suits against defendants in their individual capacities, the plaintiff must demonstrate that the defendant was either personally involved in the acts causing the deprivation of the plaintiff's constitutional rights, or that a causal connection existed between an act of the sheriff and the constitutional violation the plaintiff seeks to be redressed.  *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1986) (citing *Douthit v. Jones*, 641 F.2d 345, 346 (5th Cir. 1981)).  "A causal connection may be established, for section 1983 purposes, where the constitutional deprivation and practices occur as a result of the implementation of the sheriff's affirmative wrongful policies by his subordinates or where the sheriff wrongfully breaches an affirmative duty specially imposed upon him by state law, and as a result thereof, the complained of constitutional tort occurs."  *Id*. (cleaned up) (citations omitted).

Plaintiff's claims against Sheriff Hooper in his official capacity are effectively a suit against Nueces County.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).  As discussed above, the undersigned recommends dismissal of Plaintiff's claims with regard to Nueces County.  So too should the district court dismiss Plaintiff's claims against Sheriff Hooper in his official capacity.

In his claims against Sheriff Hooper in his individual capacity, Plaintiff asserts, in part, that Sheriff Hooper, individually, was responsible for promulgating or adopting a "medical segregation policy" of failing to provide adequate medical care, attention, medication, or emergency medical treatment and/or prompt transfer to an offsite medical facility. (Doc. No. 13, p. 18.). Plaintiff also alleges that Sheriff Hooper delayed, through policy, Plaintiff's emergency medical care and transport in violation of Plaintiff's constitutional rights under the Fourteenth Amendment and breached his statutory and ministerial responsibilities to supervise as prescribed under Texas law, specifically section 351.041 of the Texas Local Government Code, section 273.2 of the Texas Administrative Code, and sections 511.009(a)(1)-(5), (a)(19)(B), and (d)(1) of the Texas Government Code. *See* Doc. No. 13, p. 15. Plaintiff alleges, without providing specifics, that "there exists a causal link between the failure to train and supervise county and healthcare personnel . . . and the violations of Plaintiff's right to adequate medical care and prompt emergency medical services." (Doc. No. 1, p. 12; *see also* Doc. No. 13, p. 15.)

As stated above, Sheriff Hooper may be held liable in his individual capacity under § 1983 if he was either personally involved in the acts causing the deprivation of Plaintiff's constitutional rights or a causal connection exists between an act of the Sheriff and the constitutional violation Plaintiff seeks to be redressed. *See, e.g.*, *Lozano*, 718 F.2d at 768; *Douthit*, 641 F.2d at 346. Thus, to survive screening, Plaintiff's claim of Sheriff Hooper's liability must plausibly allege nonconclusory facts indicating either that Sheriff Hooper personally participated in the violation of Plaintiff's rights or that Sheriff Hooper had subjective knowledge that Plaintiff faced a substantial risk of harm to his health and safety and then disregarded that risk. *See Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021).

Here, Plaintiff does not allege how or to what extent Sheriff Hooper subjectively knew of any alleged violation of Plaintiff's rights.  Plaintiff only alleges that he sought help and intervention from his friends and relatives over his supposedly inadequate medical care in the form of an outside ambulance or "medical status/information," but that those attempts were refused, denied, or ignored by Nueces County Jail administration "or by the personal office of Sheriff J. Hooper, by and through his personal office manager/secretary."  (Doc. No. 1, p. 8; Doc. No. 13, p. 21; Doc. No. 13-1, pp. 32-33.)  Plaintiff does not present any facts in his pleadings suggesting that Sheriff Hooper himself had any personal involvement in or knowledge of the alleged violation of Plaintiff' constitutional rights.  Moreover, as discussed above, Plaintiff's generalized allegations of a "causal link" between the failure to train and supervise county and healthcare personnel and the purported delay or denial of Plaintiff's right to adequate medical care and emergency medical treatment are conclusory.  Plaintiff does not sufficiently state any "causal link" between any purported policy and Plaintiff's alleged constitutional violation.  Nor does Plaintiff sufficiently allege any conduct amounting to deliberate indifference against Sheriff Hooper.

In addition, Plaintiff's conclusory allegations that his treatment by Sheriff Hooper's alleged "failure to train or supervise" violated the Texas Administrative Code are insufficient to establish § 1983 liability.  *See Mathews v. Bowie Cnty., Tex.*, 660 F. App'x 933, 934 (5th Cir. 2015) ("Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation.").  And as discussed below, because the undersigned finds no surviving constitutional violation claims after screening, the undersigned recommends that any state law claims Plaintiff intended to bring against Sheriff Hooper also be dismissed.

Finally, to the extent that Plaintiff attempts to hold Sheriff Hooper responsible in his individual capacity for the actions of his actual or deemed subordinates – that is, Deputy Matthew, Armor, or any of Armor's employees – Plaintiff is unable to pursue such claims under § 1983. *See City of North Richland Hills*, 406 F.3d at 381 (holding supervisory officials cannot be held liable for the unconstitutional actions of their subordinates on any theory of vicarious or *respondeat superior* liability); *Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th Cir. 1999) (the acts of a subordinate "trigger no individual § 1983 liability").

Because Plaintiff's claims against Sheriff Hooper are based solely on his supervisory role, he fails to state a plausible claim against him, and the undersigned recommends that Plaintiff's claims against Sheriff Hooper in his individual capacity be dismissed with prejudice as frivolous or for failure to state a claim upon which relief can be granted.

### 4.  Plaintiff's claims against the Armor Individual Defendants and Deputy Matthew fail to plausibly allege deliberate indifference and should be dismissed.

Plaintiff sues the Individual Armor Defendants and Deputy Matthew in their individual capacities for alleged deliberate indifference to Plaintiff's serious medical needs, depriving Plaintiff of adequate medical treatment or delaying such treatment, and conspiring with each other to deprive Plaintiff of or delay such treatment, all while Plaintiff was a pretrial detainee at Nueces County Jail and the McKenzie Annex.  (Doc. No. 14, p. 26.)  In addition, Plaintiff sues Deputy Matthew, the prison official who drove Plaintiff from the Nueces County Jail to Spohn Hospital, in his individual capacity, alleging that he acted with deliberate indifference to Plaintiff's serious medical needs and inflicted "unnecessary and wanton . . . pain, agony, and suffering" when he "maliciously" confined Plaintiff in the transport van without air conditioning or air circulation to take Plaintiff to Spohn Hospital.  (Doc. No. 1, pp. 7, 15-16.)

In reviewing Plaintiff's claims as both a constitutional attack on his conditions of confinement and by the episodic acts or omissions of the Armor Individual Defendants and Deputy Matthew, the undersigned finds that any conditions of confinement claim fails here.  In his pleadings, the actual harm of which Plaintiff complains is the Armor Individual Defendants' deliberate indifference to Plaintiff's medical condition and their actions or lack thereof regarding his medical care and overall treatment during the course of his illness.  "In many jail condition cases, the conditions themselves constitute the harm.  This is true, for example, where inadequate food, heating, or sanitary conditions themselves constitute miserable conditions." *Scott*, 114 F.3d at 53.  Here, however, Plaintiff "did not suffer from the mere existence of the [above-discussed "*de facto*" policies]," but only from the Armor Individual Defendants' specific actions and omissions with regard to his care.  *Id.*  The undersigned therefore analyzes these claims under the episodic act or omissions standard because Plaintiff "faults [the Armor Individual Defendants and Deputy Matthew] for their acts or omissions" and because Plaintiff "cannot establish the existence of an officially sanctioned unlawful condition."  *Brown*, 500 F. App'x at 313.  For the reasons set forth below, the undersigned recommends dismissal of Plaintiff's claims of indeliberate indifference against all of these defendants.

### a. Episodic acts or omissions.

The Fifth Circuit has held that "the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement." *Hare*, 74 F.3d at 650.  Following *Hare*, the Fifth Circuit further explained that "[w]hen the alleged unconstitutional conduct involves an episodic act or omission, the question is whether the state official acted with deliberate indifference to the inmate's constitutional rights, regardless of

whether the individual is a pretrial detainee or state inmate." *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

"A pretrial detainee alleging acts or omissions condition of confinement claim under the Fourteenth Amendment must satisfy tests for both objective and subjective components of the claim; the same tests as a convicted inmate alleging an Eighth Amendment violation." *Matthews v. Lo*, Civ. No. 21-1862, 2022 WL 4545613, at *11 (E.D. La. Aug. 23, 2022), *adopted*, 2022 WL 4534723 (E.D. La. Sept. 27, 2022) (citing *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (for an inmate to demonstrate an Eighth Amendment claim based on prison conditions, the inmate must show a sufficiently serious deprivation, and must show that the relevant official or officials acted with deliberate indifference to inmate health or safety) and *Hare*, 74 F.3d at 643 ("Finding no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs, …we conclude that a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of deliberate indifference enunciated by the Supreme Court in [*Farmer v. Brennan*, 511 U.S. 825, 834 (1994)]")).

Under the objective component, the deprivation alleged must be "sufficiently serious," resulting in "a substantial risk of serious harm." *Farmer*, 511 U.S. at 832; *see also Valentine*, 993 F.3d at 281 (under the objective prong of the test for deliberate indifference, the inmate must first prove "an objective exposure to a substantial risk of harm"). To be "sufficiently serious," "a prison official's act or omission must result in the denial of 'the minimal measure of life's necessities,'" like medical care. *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999).

To prove the subjective prong of the deliberate indifference test, the inmate must establish that the prison official "had subjective knowledge that the inmate faced a substantial

risk of harm [to the inmate's health and safety] and … [consciously] disregarded the risk." *Valentine*, 993 F.3d at 281; *see also Lawson*, 286 F.3d at 262.  In other words, "[an] official violates a pretrial detainee's constitutional rights to be secure in his basic human needs only when the official had subjective knowledge of a substantial risk of serious harm to the detained and responded to that risk with deliberate indifference."   *Cope v. Cogdill*, 3 F.4th 198, 206-07 (5th Cir. 2021) (internal quotations and citation omitted).

"Deliberate indifference is an extremely high standard to meet."   *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001).  The Fifth Circuit has "consistently recognized … that 'deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'"   *Dyer v. Houston*, 964 F.3d 374, 381 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 458-59 (5th Cir. 2001)); *see also Aguirre v. City of San Antonio*, 995 F.3d 395, 420 (5th Cir. 2021) ("Negligence or even gross negligence is not enough:  the officials must have actual knowledge of the substantial risk.").   The Supreme Court has further explained that "an official's failure to alleviate a significant risk that he should have perceived but did not" falls short of constituting deliberate indifference.  *Farmer*, 511 U.S. at 838.  "Negligence and mistakes during treatment do not constitute deliberate indifference."  *Id.* at 835.

### b.  Inadequate medical treatment.

Plaintiff sues the Armor Individual Defendants and Deputy Matthew in their individual capacities, seeking to hold them responsible for acting with deliberate indifference to Plaintiff's "obvious" and "serious" medical needs and depriving or delaying Plaintiff from receiving adequate medical treatment during Plaintiff's confinement at the Nueces County Jail and the McKenzie Annex from around November 2020 until his transfer to TDCJ custody in November

2022.  (Doc. No. 14, p. 26.)  While housed in a county jail, detainees have "a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference."  *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021) (quoting *Thompson*, 245 F.3d at 457).  Plaintiff's allegations against these defendants are construed as raising an episodic acts or omissions due process claim.

"[T]here is no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs such as medical care."  *Reyes v. Tom Green Cnty. Jail*, No. 6:19-CV-00037-BU, 2022 WL 3588932, at *5 (N.D. Tex. Aug. 1, 2022), *adopted*, 2022 WL 3588044 (N.D. Tex. Aug. 22, 2022) (citing *Hare*, 74 F.3d at 643).  Courts, therefore, apply the same deliberate indifference standard to medical claims brought by both pretrial detainees and convicted inmates.  *Kelson*, 1 F.4th at 418.

Again, "[d]eliberate indifference is "an extremely high standard to meet."  *Domino*, 239 F.3d at 754.  To establish deliberate indifference regarding denial-of-medical care claims:

> The [pretrial detainee] must first prove objective exposure to a substantial risk of serious harm—in other words, the [pretrial detainee] must prove a serious medical need.  Second, the [pretrial detainee] must prove the officials' subjective knowledge of this substantial risk.  Third, the [pretrial detainee] must prove that the officials, despite their actual knowledge of the substantial risk, denied or delayed the [pretrial detainee's] medical treatment.  Finally, the [pretrial detainee] must prove that the delay in or denial of medical treatment resulted in substantial harm, such as suffering additional pain.  Importantly, disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference.

*Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019) (cleaned up); *see also Estate of Bonilla v. Orange Cnty.*, 982 F.3d 298, 305 (5th Cir. 2020) ("To prove deliberate indifference, the Plaintiffs must show that the defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that the defendants actually drew the inference, and that the defendants disregarded that risk by failing to take reasonable measures to

abate it." (cleaned up)).   A serious medical need is "one for which treatment has been

recommended or for which the need is so apparent that even laymen would recognize that care is

required."   *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006).

In the context of medical treatment, the prisoner must show "that prison officials refused

to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any

similar conduct that would clearly evince a wanton disregard for any serious medical needs."

*Gobert*, 463 F.3d at 346 (internal quotation marks and citation omitted).   As noted above,

"deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent

response to a substantial risk of serious harm."   *Dyer*, 964 F.3d at 381 (internal quotations and

citation omitted).

In reviewing Plaintiff's claims, the undersigned has considered whether Plaintiff has

alleged facts indicating that medical officials knew of and yet disregarded an excessive risk to

Plaintiff's health or safety.   *See Farmer*, 511 U.S. at 837.   The required mental state amounts to

"subjective recklessness," a question of fact.   *See Thompson v. Texas Department of Criminal

Justice*, 67 F.4th 275, 281 (5th Cir. 2023).   Subjective knowledge can, under exceptional

circumstances, be inferred from the obviousness of the substantial risk.   *Id.* (citing *Reeves v.

Collins*, 27 F.3d 174, 176 (5th Cir. 1994)).

As discussed next, the undersigned concludes that Plaintiff has failed to plausibly allege

that any of the Armor Individual Defendants or Deputy Matthew were deliberately indifferent.

### i.  Dr. Cano.

Plaintiff accuses Dr. Cano of acting with deliberate indifference to Plaintiff's serious

medical needs when Plaintiff was confined at the Nueces County Jail, violating Texas jail

healthcare standards and policies, and conspiring to violate Plaintiff's constitutional rights by

failing to prescribe medication and treatment for Plaintiff's "obvious and serious medical needs," specifically for a tooth infection and after an x-ray examination purportedly found Plaintiff had symptoms of pneumonia.  (Doc. No. 1, p. 3; Doc. No. 13, p. 4.)  Plaintiff describes his frustration with Dr. Cano for denying Plaintiff's request to be transferred to a hospital to receive medical care that he was not otherwise receiving from Armor and for allegedly being unable to diagnose Plaintiff's symptoms and only prescribing Plaintiff medications he "should not be on."  (Doc. No. 13, pp. 38, 40; Doc. No. 13-1, p. 16.)  Plaintiff claims that later, in June 2021, after Plaintiff's hospitalization, Dr. Cano allegedly told him that he had symptoms of pneumonia, after x-ray findings purportedly showed "liquid [] in Plaintiff's left lung," but that Dr. Cano did not prescribe medication for the pneumonia, stating that medication would not be "required or necessary."  (Doc. No. 14, p. 6.)

A prison official is deliberately indifferent if he or she has actual knowledge of a substantial risk of harm to an inmate and disregards that substantial risk.  *Farmer*, 511 U.S. at 845.  "[T]he prisoner must show that the defendants (1) were aware of facts from which an inference of an excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed."  *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998) (citing *Farmer*, 511 U.S. at 837).  "Under exceptional circumstances, a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of a substantial risk."  *Id.* (citing *Farmer*, 511 U.S. at 842 & n.8).  The Supreme Court has reaffirmed that "deliberate indifference" is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action....  The 'deliberate indifference' standard permits courts to separate omissions that 'amount to an intentional choice'

from those that are merely 'unintentionally negligent oversight[s].'" *Southard v. Tex. Bd. of Crim. Just.*, 114 F.3d 539, 551 (5th Cir. 1997) (citations omitted).

As such, inadequate medical treatment of inmates, at a certain point, may conceivably rise to the level of a constitutional violation for deliberate indifference, while malpractice or negligent care will not. *See Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993) ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action."); *Williams v. Treen*, 671 F.2d 892, 901 (5th Cir. 1982) ("mere negligence in giving or failing to supply medical treatment would not support an action under Section 1983."); *see also Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).

The Constitution only requires that prisoners receive adequate medical care, not optimal medical care. *See, e.g.*, *Gobert*, 463 F.3d at 346. A prisoner's mere disagreement with his medical treatment does not state a claim for Eighth Amendment indifference to medical needs. *Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756; *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

Here, although Plaintiff has recounted various medical afflictions, he nonetheless has failed to plausibly allege that Dr. Cano acted with deliberate indifference to his medical needs. Plaintiff's own allegations reflect that Dr. Cano oversaw Plaintiff's care, examined him, and prescribed him medication over the course of Plaintiff's confinement in the Nueces County Jail. There is no allegation that Dr. Cano deliberately refused Plaintiff medical treatment. Liberally construing Plaintiff's allegations and accepting them as true, Plaintiff fails to plausibly allege that Dr. Cano "refused to treat him, ignored his complaints, intentionally treated him incorrectly,

or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Gobert*, 463 F.3d at 346.

With regard to Dr. Cano's purported deliberate indifference to Plaintiff's alleged pneumonia, Plaintiff's liberally construed claims fall short of sufficiently pleading that Dr. Cano acted with deliberate indifference to Plaintiff's medical needs.  Plaintiff's allegations and submissions reflect that Dr. Cano examined Plaintiff, and although he allegedly did not prescribe Plaintiff with medication to treat Plaintiff's alleged pneumonia, Plaintiff's own allegations make plain that Dr. Cano made a medical judgment not to prescribe medication.  *See* Doc. No. 14, p. 6 ("It was also Dr. Cano['s] medical opinion that even though Plaintiff was diagnosed with [pneumonia] that no medication treatment would be needed, required or necessary for treatment of the [pneumonia].")  A medical decision not to prescribe medication to Plaintiff is not a deliberate refusal to treat Plaintiff.  It is not the role of this Court to second-guess Dr. Cano's medical decisions and treatment simply because Plaintiff is dissatisfied with his care.  Plaintiff must plausibly allege something more than mere disagreement with his level of care, even if that care was arguably ineffective.  *See Davidson v. Tex. Dep't of Crim. Just.*, 91 F. App'x 963, 965 (5th Cir. 2004) (citing *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999) and *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995)).  Plaintiff's submissions also indicate that there were there were follow-up appointments regarding Plaintiff's medical care and treatment.  In short, Plaintiff fails to plausibly allege that Dr. Cano refused to treat him or that Dr. Cano deliberately treated him incorrectly.

Likewise, with regard to Plaintiff's grievances about his tooth infection, Plaintiff fails to plausibly allege deliberate indifference.  Plaintiff's allegations are only detailed within the inmate communication forms, which include three requests specifically mentioning it.  *See* Doc.

No. 13-1, pp. 2-3, 8.[13]  But Plaintiff fails to plausibly allege facts indicating that his dental condition posed a substantial risk of harm to him.  Meanwhile, in responding to Plaintiff's requests, the medical staff noted: (1) that Plaintiff has been referred to the dentist, *id*. at 2; (2) that Plaintiff is on the waiting list to be seen by the dentist, and that the waiting list is "long" and "averages several weeks," *id*. at 3; and (3) that the issue "is already being addressed" and that Plaintiff would be seen once his unit was no longer in quarantine, *id*. at 8.  These forms demonstrate that Plaintiff's requests were not being ignored, despite any delay in receiving treatment from Dr. Cano or another medical provider.  *See Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995) ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference"); *see also Garcia v. Dawson County Sheriffs and Jailer/Agents*, No. 5:09-CV-210, 2010 WL 5287550, at *3 (N.D. Tex. May 28, 2010) (plaintiff had failed to show that two-month delay in receiving dental care for a painful tooth caused him substantial harm).

Finally, Plaintiff's contention that the substantial risk was "obvious" falls short of a plausible allegation.  Although Dr. Cano may have been aware of Plaintiff's symptoms through Plaintiff's complaints and through examination, Plaintiff's allegations reflect that Dr. Cano attempted to treat Plaintiff and made medical determinations about Plaintiff's condition. Significantly, Plaintiff alleges that the doctors at Spohn Hospital told Plaintiff that his condition was "rare" and "unheard of."  (Doc. No. 13, p. 45.)  This is further indication that Dr. Cano lacked the required *mens rea* to have known of a substantial risk to Plaintiff's health and then responded with deliberate indifference.  There is no indication that Dr. Cano recognized a risk of

---

[13] Plaintiff does not allege that Dr. Cano was responsible for providing dental care in addition to medical care.  But because Plaintiff does not name any other medical provider in his submissions, the undersigned liberally construes Plaintiff's submissions as raising a deliberate indifference claim against Dr. Cano regarding his tooth infection.

harm to Plaintiff from the symptoms following his evaluations.  *Cf. Thompson*, 67 F.4th at 282 (no deliberate indifference where doctor listened to plaintiff and found no emergency medical issues).

Plaintiff's deliberate indifference claims against Dr. Cano should be dismissed as frivolous and for failure to state a claim for which relief can be granted.

### ii. Nurse Barbara.

Plaintiff holds Nurse Barbara responsible for acting with deliberate indifference when she allegedly placed Plaintiff in medical segregation at Nueces County Jail rather than ordering that he be sent to an outside hospital, depriving Plaintiff of emergency medical services until Plaintiff was "near death."  (Doc. No. 13, pp. 4, 17.)  Plaintiff also alleges that Nurse Barbara "conspired" with unnamed others to enforce Armor's cost containment policy, claiming Nurse Barbara was the "only" individual with the authority to approve emergency medical transfer to an offsite medical facility and that she made decisions regarding that emergency medical care "without directly observing, examining, or otherwise communicating" with him or other inmates.  *Id*. at 4, 17.

However, Plaintiff alleges no specific interactions or events in which Nurse Barbara was aware of Plaintiff's medical condition or that she actually made any decision about anything, much less that Nurse Barbara denied Plaintiff any medical treatment at the jail or emergency medical treatment at any off-site location.  Nor does he allege any actions taken by Nurse Barbara that evidence her subjective knowledge of any specific medical need of his, or her deliberate indifference to Plaintiff's medical needs.  As such, he alleges no specific facts to support his denial-of-medical care claim, rendering that claim threadbare and conclusory.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Likewise deficient is Plaintiff's conspiracy

claim against Nurse Barbara because he does not plausibly allege any facts indicating an agreement between Nurse Barbara and any other person to violate Plaintiff's rights. Accordingly, the undersigned recommends that Plaintiff's deliberate indifference and conspiracy claims against Nurse Barbara be dismissed with prejudice as frivolous and for failure to state a claim upon which relief can be granted.

### iii. PA Steve and Nurse Thelma.

Plaintiff accuses PA Steve of acting with deliberate indifference to Plaintiff's serious medical needs when he purportedly "negligently" administered medication that caused Plaintiff to experience "serious" medical side effects while Plaintiff was confined at the Nueces County Jail. (Doc. No. 13, p. 5.) Plaintiff also alleges that Nurse Thelma is not licensed to practice or administer medication but that she nonetheless instructed PA Steve to administer medication that caused Plaintiff to suffer from "serious" medical side effects while Plaintiff was confined at the jail. (Doc. No. 13, p. 5.) Plaintiff also claims that Nurse Thelma conspired with Dr. Cano because Nurse Thelma served as Dr. Cano's assistant and "supported Dr. Cano's choices and decision[s] on all patient cases." *Id*.

In a series of inmate communication forms, Plaintiff details suffering from side effects from medication prescribed to treat several afflictions.[14] The undersigned nonetheless liberally construes Plaintiff's grievances about the symptoms of the medications' side effects as a result of PA Steve's and Nurse Thelma's actions, rather than actions of any medical professional at Spohn

---

[14] Plaintiff's submitted exhibits squarely contradict his claim that his complaints were "ignored." Medical staff noted in at least ten responses to Plaintiff's inmate communication form requests that they had referred or scheduled Plaintiff to be seen by a medical provider, *see* Doc. No. 14-2, pp. 2-3, 6, 7, 10, provided instructions and notes regarding Plaintiff's medication, *id*. at 9, 11, 12, or that Plaintiff's issue had been addressed, *id*. at 13. Although the forms do not reflect which specific medical employees addressed Plaintiff's grievances, they contradict Plaintiff's allegation of deliberate indifference on the basis that Plaintiff's complaints were ignored by Armor employees writ large. *See Rogers*, 660 F. App'x at 285 n.6 ("When 'an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls.'" (quoting *United States ex rel. Riley*, 355 F.3d at 377)). Plaintiff may not have received the specific care he wanted, but he was not ignored.

Hospital who may have prescribed those medications, because Plaintiff states that PA Steve and Nurse Thelma administered Plaintiff's medication shortly after Plaintiff was released from Spohn Hospital.  (Doc. No. 13, p. 5.)

As stated above, although inadequate medical treatment of inmates, at a certain point, may rise to the level of a constitutional violation, malpractice or negligent care does not. *Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999); *Mendoza*, 989 F.2d 191, 193 (5th Cir. 1993) ("It is clear that negligent medical treatment is not a cognizable basis upon which to predicate a section 1983 action."); *Treen*, 671 F.2d 892, 901 (5th Cir. 1982) ("mere negligence in giving or failing to supply medical treatment would not support an action under Section 1983."); *see also Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).  Here, Plaintiff claims that PA Steve and Nurse Thelma engaged in "negligent" actions of giving Plaintiff medication that allegedly led to serious side effects.  Plaintiff does not contend that PA Steve or Nurse Thelma deliberately treated Plaintiff incorrectly.  Plaintiff's allegation, stated in his own words (*see* Doc. No. 1, pp. 6, 14-15), implies only negligence, not deliberate indifference.  *Cf. Morgan v. TDCJ*, 537 F. App'x 502, 507 (5th Cir. 2013) (prescribing a treatment that causes serious side effects does not rise to the level of a constitutional violation); *Dallas v. Stalder*, 73 F. App'x 79, 2003 WL 2176645, at *1 (5th Cir. June 24, 2003) (failing to advise an inmate of the side effects of a medication, for which he received medical care, is not cognizable under § 1983).  Thus, Plaintiff has failed to allege a constitutional violation arising from the medical care he received from either PA Steve or Nurse Thelma.

Plaintiff's allegation that Nurse Thelma "conspired" with Dr. Cano is conclusory. Plaintiff fails to allege any non-conclusory facts, or indeed any facts at all, indicating any agreement by Nurse Thelma with anyone to violate his rights.  Additionally, a conspiracy to

deprive a plaintiff of constitutional rights is not actionable under § 1983 without an underlying constitutional violation.  *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995).  With regard to PA Steve and Nurse Thelma, Plaintiff fails to plausibly allege any constitutional violation. Therefore, his conspiracy claim against Nurse Thelma should be dismissed.

### iv.  Nurse Marsha and Nurse Tamara.

Plaintiff holds Nurse Marsha responsible for acting with deliberate indifference towards Plaintiff's "serious" medical needs and "conspiring" with others at the McKenzie Annex when she "knowingly and intentionally" denied adequate medical care to Plaintiff.  (Doc. No. 1, p. 6; Doc. No. 13, pp. 5-6.)  Plaintiff also claims that Nurse Tamara acted with deliberate indifference towards Plaintiff's "serious" medical needs and conspired with others when she denied Plaintiff medical care, despite "knowing" that Plaintiff needed medical attention when he allegedly began experiencing symptoms on May 6, 2021.  (Doc No. 1, p. 6; Doc. No. 13, p. 6.)  Plaintiff states that Nurse Tamara and Nurse Marsha conspired to act with deliberate indifference to Plaintiff's medical needs by dismissing Plaintiff's respiratory symptoms after their examination of Plaintiff determined that his oxygen levels were "good."  (Doc. No. 13-1, p. 31.)

As explained above, negligent medical treatment is not a cognizable basis upon which to predicate a § 1983 action.  *Mendoza*, 989 F.2d at 193; *Treen*, 671 F.2d at 901 ("mere negligence in giving or failing to supply medical treatment would not support an action under Section 1983."); *see also Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989).  Prisoners are only entitled to adequate medical care; the Constitution does not require that it be the finest.  *See, e.g.*, *Spriggens v. LaRavia*, No. 11-2266-SS, 2012 WL 1135845, at *2 (E.D. La. Apr. 4, 2012) ("The fact that an inmate's medical treatment an inmate's medical treatment 'may not have been the best money could buy' is insufficient to establish a federal violation." (citing *Mayweather v.*

*Foti*, 958 F.2d 91, 91 (5th Cir. 1992)); *Gobert*, 64 F.3d at 346 (an inmate's constitutional rights are not violated simply because his medical treatment is unsuccessful).  Although Plaintiff disagrees with Nurses Marsha and Tamara's determination that his oxygen levels were "good" despite his respiratory symptoms, his allegations reflect that they did listen to his complaints and then examined him.  Plaintiff's mere disagreement with his medical treatment does not sufficiently state a claim for deliberate indifference to his medical needs.  *Cf. Gobert*, 463 F.3d at 346; *Domino*, 239 F.3d at 756; *Norton v. Dimazana*, 122 F.3d at 292.

In addition, Plaintiff's claim that Nurse Tamara and Nurse Marsha engaged in a conspiracy to harm Plaintiff by their deliberate indifference is conclusory.  Again, Plaintiff fails to allege any non-conclusory facts, or indeed any facts at all, evidencing any agreement to violate his rights.  Additionally, Plaintiff fails to plausibly allege any underlying constitutional violation, so his conspiracy claim should be dismissed for that reason as well.  *Cf. Hale*, 45 F.3d at 920.

### v. *Nurse Evonne.*

Plaintiff accuses Nurse Evonne of acting with deliberate indifference to Plaintiff's serious medical needs when she delayed Plaintiff's receipt of his medications at the Nueces County Jail, presumably upon his return from the hospital.  (Doc. No. 13, p. 6.)  Liberally construing Plaintiff's allegations as relating to his claim against Nurse Evonne,[15] Plaintiff claims he was prescribed seven or eight different medications as part of his post-hospitalization treatment plan, but that Nueces County Jail medical staff delayed giving Plaintiff his medications by allegedly

---

[15]  As noted above, Plaintiff does not name any specific defendant as responsible for the alleged delay of Plaintiff's medication.  However, elsewhere in his response to the Court's questionnaire, Plaintiff accuses Nurse Evonne of hindering Plaintiff's timely receipt of the medications.  (Doc. No. 13, p. 6.)

pushing the P.M. medication pass until the "late night evenings," leading Plaintiff to experience symptoms of nausea and vomiting. *Id*. at 46; Doc. No. 14, p. 4.[16]

In order to lodge a viable claim for delayed medical treatment, there must have been deliberate indifference resulting in substantial harm. *See, e.g.*, *Mendoza*, 989 F.2d at 193. In *Mendoza*, the Fifth Circuit affirmed the lower court's dismissal of a prisoner plaintiff's claims of an alleged delay of physical therapy medical treatment as frivolous because the court found that the plaintiff had received ongoing medical treatment for his back problems. *Id*. at 193-94. Here, Plaintiff provided inmate communication forms, which provide a contradicting statement about his symptoms of nausea and vomiting. "When 'an allegation is contradicted by the contents of an exhibit attached to the pleading, then indeed the exhibit and not the allegation controls.'" *Rogers*, 660 F. App'x at 285 n.6.

Generally, "[b]rief delays in receiving pain medication and medical care do not rise to claims of a constitutional dimension." *Fenlon v. Quarterman*, 350 F. App'x 931, 934 (5th Cir. 2009). Yet, even if Plaintiff's symptoms of nausea and vomiting are attributable to what appears to be a brief delay in receiving medication, and even assuming that nausea and vomiting constitute "substantial harm," Plaintiff does not assert that Nurse Evonne knew that Plaintiff faced a substantial risk of serious bodily harm and that she disregarded that risk by failing to take measures to abate it. *Gobert*, 463 F.3d at 346. Thus, Plaintiff has failed to state a claim regarding Nurse Evonne's alleged delay in medical treatment.

Plaintiff also seeks to hold Nurse Evonne responsible for conspiring with unnamed others by allegedly interfering with Plaintiff's grievance process. (Doc. No. 13, p. 6.) However,

---

[16] Paradoxically, Plaintiff also alleged in an inmate communication form written three days after being released from the hospital that he believed he received *too many* medications, because those medications were allegedly causing him to vomit. *See* Doc. No. 14-2, p. 2.

Plaintiff fails to assert any facts alleging that Nurse Evonne played any role in Plaintiff's filing of any grievance, or that Plaintiff was unable to file any grievance because of any act by Nurse Evonne.  He also fails to allege that any agreement existed between Nurse Evonne and anyone else to interfere with Plaintiff's filing of any grievance.  As such, Plaintiff's conspiracy allegation is threadbare and conclusory and should be dismissed.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

### vi.  Nurse Tina and Nurse Betty.

Plaintiff accuses Nurse Tina and Nurse Betty of acting with deliberate indifference towards Plaintiff's medical needs at the Nueces County Jail when they allegedly refused Plaintiff adequate medical attention, cussed at Plaintiff for being unable to get up from bed because of his illness, and ignored Plaintiff's pleas for help.  (Doc. No. 13, p. 7.)  Specifically, Plaintiff alleges that, on some occasions during the medication "pass" rounds, where medical staff would distribute prisoners' medications, Nurse Tina and Nurse Betty would "get angry" and "cuss" at Plaintiff for his alleged inability to get out of bed to receive his medication; he claims that these nurses neglected Plaintiff's pleas for help.  *Id*. at 38.  Plaintiff also claims that Nurse Tina and Nurse Betty conspired to deny Plaintiff adequate medical care.  *Id*.

Although Plaintiff alleges that Nurse Tina and Nurse Betty berated Plaintiff for his inability to stand up to receive his medication, he does not allege that they failed to actually provide Plaintiff with his medication on any occasion.  Plaintiff's allegations of verbal abuse, without more, are not actionable under § 1983.  *See Siglar v. Hightower*, 112 F.3d 191, 193-94 (5th Cir. 1997); *Calhoun v. Hargrove*, 312 F.3d 730, 734 (5th Cir. 2002).  Plaintiff claims no physical harm from Nurse Tina's and Nurse Betty's actions.  He does not claim that he did not actually receive his medication from them.  And, "[a]lthough it is an open question in this circuit

whether the Eighth Amendment protects individuals against psychological injury, *de minimis* psychological injury is not sufficient to state a claim under § 1983." *Graves v. Doe*, 77 F.3d 479 (5th Cir. 1996) (internal citations omitted) (affirming district court's dismissal of inmates claim that guards ridiculed him and invited inmates to do so as well for inmate suffered no harm other than the verbal harassment itself). Thus, the undersigned recommends that Plaintiff's Fourteenth Amendment deliberate indifference claims against Nurse Tina and Nurse Betty be dismissed with prejudice as frivolous and for failure to state a claim.

### vii. Nurse Jennifer.

Plaintiff alleges that Nurse Jennifer did not provide the adequate medical care "required" for Plaintiff's condition while he was confined at the Nueces County Jail, did not have the training or knowledge necessary to treat Plaintiff, and otherwise acted with deliberate indifference towards Plaintiff's serious medical needs. (Doc No. 1, p. 7; Doc. No. 13, pp. 6, 8.) Specifically, Plaintiff claims that Nurse Jennifer attempted to help Plaintiff in the days before Plaintiff was transferred to the hospital. However, Plaintiff alleges, she was unable to understand his symptoms and failed to recommend that Plaintiff be transferred for off-site medical treatment at a hospital or facility. (Doc. No. 13, p. 41.)

As stated above, negligent medical treatment is not a cognizable basis upon which to predicate a § 1983 action. *Mendoza*, 989 F.2d at 193. Plaintiff does not allege that Nurse Jennifer ignored Plaintiff's symptoms or refused him medical treatment. In fact, Plaintiff alleges the contrary: that Nurse Jennifer offered to help. Her alleged inability to understand what treatment Plaintiff needed is an issue of, at worst, negligence on her part. "[M]ere negligence in giving or failing to supply medical treatment would not support an action under Section 1983." *Treen*, 671 F.2d at 901. Thus, Plaintiff fails to plausibly allege any constitutional violation

arising from the care he received (or failed to receive) from Nurse Jennifer, and the undersigned therefore recommends that his claim against Nurse Jennifer be dismissed as frivolous and for failure to state a claim.

### viii.  Deputy Matthew.

Plaintiff alleges Deputy Matthew acted with deliberate indifference to Plaintiff's serious medical needs and subjected Plaintiff to cruel and unusual punishment by "maliciously" confining Plaintiff in a transport van without air conditioning or air circulation when he drove Plaintiff approximately two miles from the Nueces County Jail to Spohn Hospital.[17]  (Doc. No. 1, pp. 7, 15-16.)  Plaintiff claims that the heat in the transport van exacerbated Plaintiff's already existing pain and caused him to suffocate, hyperventilate, and sweat because of the heat, inflicting "unnecessary and wanton . . . pain and suffering" from his actions.  *Id*. at 7-8.

An official acts with deliberate indifference only if he knows the prisoner faces a substantial risk of serious bodily harm and if he disregards that risk by failing to take measures to abate it.  *Gobert*, 463 F.3d at 346.  It is well settled that deliberate indifference cannot be inferred from a negligent - or even a grossly negligent - response to a substantial risk of harm; rather, "it requires a showing of wanton disregard for the prisoners' safety or recklessness."  *See Valentine*, 993 F.3d at 281.  Actions by prison officials that are "merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference. . . ."  *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Servs.*, 380 F.3d 872, 883 (5th Cir. 2004).  An official's failure to alleviate a significant risk that the official should have perceived, but did not. also does not constitute deliberate indifference.  *See Farmer*, 511 U.S. at 836-40.

---

[17]  The undersigned has taken judicial notice that the Nueces County Jail is less than two miles from Spohn Hospital.

Several cases help illuminate what constitutes deliberate indifference during a transport van transfer.  In *Rogers v. Boatright*, for example, a defendant corrections officer knew that the inmate was shackled and without a seatbelt in the prison van's security cage, yet drove the van recklessly, allegedly injuring the plaintiff.  709 F.3d 403, 409 (5th Cir. 2013).  The plaintiff alleged that the defendant officer had told another officer that other inmates similarly had been injured the prior week and during other incidents, which "happen [] all the time."  *Id*.  Accepting the plaintiff's allegation about the defendant officer's statement, the Fifth Circuit held that the plaintiff sufficiently alleged a claim of deliberate indifference.  *Id*.  By contrast, in *Crumbliss v. Darden*, a prisoner was in a wheelchair with a brace on his leg because of a prior injury.  469 F. App'x 325, 326 (5th Cir.2012).  Although the defendant prison guards knew that there were no straps in the van to secure the wheelchair, the defendant supervisor instructed the guards to use the van to transport the prisoner.  *Id*.  Although the prisoner's leg was reinjured when the chair was jostled because of the way the van was being driven by one of the guards, the Fifth Circuit upheld the district court's determination that the defendants had not acted with deliberate indifference because the prisoner had not demonstrated that the defendants knew subjectively that the prisoner had been placed at substantial risk of serious harm.  *Id*. at 327.  In *Cooks v. Crain*, meanwhile, the Fifth Circuit affirmed the dismissal of a civil rights complaint alleging that an inmate had been transported in vehicles that lacked seatbelts because the inmate's complaint did not concern the deprivation of any federally protected right or a "present and continuing harm," but merely asserted "the need for an extra measure of safety against the possibility of harm."  327 F. App'x 493, 494 (5th Cir. 2009).

Plaintiff's case is more like *Crumbliss* and *Cooks* than *Rogers*.  Although Plaintiff adequately alleges that Deputy Matthew knew Plaintiff was ill in some way (because Deputy

Matthew was taking Plaintiff to the hospital and because he assisted Plaintiff into the transport van), Plaintiff fails to allege that the short drive from the jail to the hospital concerned a "present and continuing harm," such as that other inmates were subjected to similar conditions or that the experience itself had lasting effects on Plaintiff's health. *Cf. Helling v. McKinney*, 509 U.S. 25, 35 (1993) (plaintiff plausibly stated a cause of action by alleging that the defendants had, with deliberate indifference, exposed him to excessive levels of second-hand smoke that posed an unreasonable risk of significant harm to his future health by keeping him in a cell with a heavy smoker). Plaintiff also does not allege that he remained in the van for a long period of time, and in fact the drive to Spohn Hospital from Nueces County Jail is only approximately two miles, as stated above. Moreover, Plaintiff alleges no facts indicating that Deputy Matthew subjectively knew of any substantial risk of serious harm to Plaintiff from the temperature of the van. Plaintiff therefore fails to plausibly allege deliberate indifference on the part of Deputy Matthew, and his claim should be dismissed.

### 5. *Plaintiff's retaliation claim against Nurse Marsha should be dismissed.*

Plaintiff claims that he was subjected to retaliation by Nurse Marsha in violation of the First Amendment. This claim should be dismissed.

Plaintiff alleges that in late February 2021 he complained to Director Washington that he did not want to be seen or treated by Nurse Marsha because she was "treating him with malice and discriminatorily and neglecting/refusing him proper medical treatment and examinations." (Doc. No. 13, p. 25.) Director Washington allegedly assured Plaintiff on February 26 that Plaintiff would receive treatment for both of his allegedly infected ears, and that he had investigated Plaintiff's complaint and addressed the matter with Nurse Marsha. *Id.* Plaintiff alleges that he was then "unexpectedly" transferred to the Nueces County Jail from the

McKenzie Annex the next day, February 27, and that he was assigned to a wing with "lockdown status" for 23 hours each day.  This occurred, Plaintiff says, because Nurse Marsha had fabricated allegations of Plaintiff exhibiting inappropriate behavior towards a physician assistant after Plaintiff's complaint about Nurse Marsha.  *Id.*  In a March 1, 2021, grievance, Plaintiff asserted that he "was transferred from Annex to main jail on Saturday 2/27/2021 for *medical reclassification purposes* . . . I was requesting medical treatment for ear infections and 'hole' in left ear—not to be retaliated and transferred []."  *Id*. at 26 (emphasis added); *see also* Doc. No. 13-1, p. 19.  Plaintiff further alleges that during a visit on March 2, Dr. Cano told Plaintiff that he was moved from the McKenzie Annex to the main jail because of the allegations communicated by Nurse Marsha.  (Doc. No. 13, p. 26.)  Plaintiff states that he filed a grievance about the allegedly false allegations on March 5, and that his ear condition deteriorated.  *Id.* at 26-27; *see also* Doc. No. 13-1, pp. 20-22.  Only after a phone call to Sheriff Hooper's office on March 16 or 17 from a friend of Plaintiff's did jail officials speak with Plaintiff about his medical condition, at which time Plaintiff was provided with antibiotics and treatment.  (Doc. No. 13, pp. 27-28.)

"Prison officials may not retaliate against prisoners for exercising their constitutional rights," including their "First Amendment right to file grievances."  *Butts v. Martin*, 877 F.3d 571, 588 (5th Cir. 2017).  The purpose for allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights.  *See Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006).  But courts view prisoner retaliation complaints with skepticism, "lest the federal courts potentially embroil themselves in every adverse action that occurs within a penal institution."  *Mercer v. Soong*, Civ. No. 19-442, 2020 WL 6163621, at *2 (M.D. La. Sept. 25, 2020), *adopted*, 2020 WL 6163131 (M.D. La. Oct. 30, 2020).  To state a claim for retaliation under § 1983, a prisoner must allege "(1) a specific constitutional right, (2)

the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Butts*, 877 F.3d at 588 (quoting *Jones*, 188 F.3d at 324-25). Moreover, a prisoner "must allege more than *de minimis* retaliation to proceed with such a claim." *Morris*, 449 F.3d at 684-85. "Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Id.* at 685.

Where an inmate was allegedly transferred to a food services job and thus "limited to approximately five hours per week to conduct legal research," the Fifth Circuit determined that the evidence did not support a retaliation claim because limiting the inmate to five hours of library time per week did not violate the inmate's access to the court. *Jones*, 188 F.3d at 325-26. Similarly, the Fifth Circuit held that an inmate's allegation that a defendant retaliated against him by removing him from his prison job and later transferring him to another prison failed to support an actionable retaliation claim as "[a] prisoner has no constitutionally protected interest in a particular facility or a specific work assignment." *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996) (*per curiam*).

Yet, an alleged adverse retaliatory act against an inmate was sufficient where, following an inmate's filing of a grievance, an official "filed a disciplinary report" against the inmate and the inmate alleged that another official "accepted the disciplinary charge, that he was convicted in a disciplinary proceeding ..., and that he was punished with 27 days of commissary and cell restrictions." *Hart v. Hairston*, 343 F.3d 762, 763 (5th Cir. 2003). In *Parker v. Carpenter*, a pretrial detainee, after allegedly having a "verbal altercation with a jail officer," was transferred "from the low risk minimum security section to the overcrowded violent inmate section" of a jail. 978 F.2d 190, 192 (5th Cir.1992). He alleged that, in the violent inmate section, he was

"denied access to a bed to lay down on, despite jail official's knowledge of his serious back condition." *Id*.  The Fifth Circuit found a cognizable claim for retaliation under § 1983, particularly "because pretrial detainees are entitled to protection from adverse conditions of confinement created by prison officials for punitive purposes."  *Id*. at 192-93.

Liberally construed and accepted as true, Plaintiff's allegations indicate that he complained about Nurse Marsha for refusing to provide him with medical treatment, and that Nurse Marsha then responded by making false allegations about inappropriate conduct by Plaintiff toward a female physician assistant.  Plaintiff sufficiently sets forth a specific constitutional right, his First Amendment right to submit grievances, in satisfaction of the first prong of the inquiry.  Plaintiff too meets the second prong for purposes of screening, because he alleges that Dr. Cano "informed" Plaintiff "that the reason why he was moved from McKenzie Annex Jail was due to the allegations," for the female physician's safety, and that "Nurse Marsha . . . was responsible for the false allegations . . . apparently because [she] was upset" at Plaintiff's grievances against her.  *See* Doc. No. 13, p. 26.  Plaintiff also alleges, through his inmate correspondence form, that Dr. Cano told him that the allegations were fabricated.  *See* Doc. No. 13-1, p. 20.

The issue is whether Plaintiff has plausibly alleged a qualifying retaliatory adverse act— the third prong—which must be "more than *de minimis* retaliation" to proceed with his claim. *Morris*, 449 F.3d 682, 684-85.  "To satisfy the *de minimis* test for purposes of the third prong, a prisoner must allege adverse facts that rise 'to the level of that which would deter the exercise of a constitutional right.'"  *Mitchell v. Denton Cnty.*, No. 4:18-CV-399-ALM-KPJ, 2022 WL 989392, at *7 (E.D. Tex. Feb. 28, 2022), *adopted*, 2022 WL 9897819 (E.D. Tex. Mar. 31, 2022) (quoting *Morris*, 449 F.3d at 686).  In *Mitchell*, the court found that because the plaintiff's

placement in an isolation cell and his non-punitive segregation after he filed suit against defendants did not deter the plaintiff "from further exercising his constitutional rights[,]" he did not satisfy the *de minimis* test. *Id.*

In this case, Plaintiff states that he was transferred to the main Nueces County Jail from the McKenzie Annex because of Nurse Marsha's claims against him, that he was assigned to a "transient" wing, and that that wing was purportedly on lockdown status for 23 hours a day. But Plaintiff fails to plausibly allege any retaliatory adverse act: he states only that he was thereafter transferred to the main jail and was assigned to a wing that was undergoing lockdown. He does not allege any punitive or disciplinary consequence resulting from his complaint about Nurse Marsha or about Nurse Marsha's subsequent allegedly fabricated allegation, other than the alleged fact that he was moved to a wing that was under "lockdown status." Plaintiff's lockdown, in his own words, was not imposed specifically on him but applied to the entire wing where he was assigned. Moreover, Plaintiff alleges in his grievance that he was transferred for "medical reclassification purposes."

Nonetheless, even if Plaintiff's transfer and subsequent lockdown status were effected with retaliatory intent by Nurse Marsha, his allegation does not rise above *de minimis* retaliation because despite Nurse Marsha's actions, Plaintiff's filing of grievances continued unabated. And Plaintiff does not allege that he was denied medical treatment altogether, only that he was denied what in his opinion was "proper" medical treatment. Plaintiff states he was examined by Dr. Cano even after his transfer to the main jail (which was also when he purportedly learned about Nurse Marsha's allegations against him). In addition, with relation to the causal question of the fourth and final prong of the test, Plaintiff does not claim that any delay in medical treatment between March 5 and March 16 or 17 was a result of Nurse Marsha's purported retaliation.

Plaintiff therefore fails to plausibly allege an actionable retaliation claim against Nurse Marsha, and the undersigned recommends dismissal of that claim.

### 6.  Plaintiff's excessive force claim against Deputy Matthew should be dismissed.

In addition to alleging a deliberate indifference claim, Plaintiff sues Deputy Matthew in his individual capacity, claiming that Deputy Matthew used excessive force when he "compelled" Plaintiff, by taking his arm, to exit the transport van and walk into the hospital, despite "knowing that Plaintiff was in serious/critical condition."  (Doc No. 1, p. 9; Doc. No. 13, pp. 42-43.)

To sufficiently state an excessive force claim under the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).  A pretrial detainee can prevail only if he or she shows that the defendant applied force in a manner that was not rationally related to a legitimate nonpunitive governmental purpose, or that the actions were excessive in relation to that purpose.  *Id*. at 398.

Objective reasonableness, for purposes of the *Kingsley* analysis, turns on the facts and circumstances of each particular case.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The reasonableness of the force used must be assessed "from the perspective and with the knowledge of the defendant officer" and with "deference to policies and practices needed to maintain order and institutional security."  *Kingsley*, 576 U.S. at 399.  In determining the objective reasonableness of an officer's use of force, courts consider at least the following non-exclusive factors, enumerated in *Kingsley*: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or limit the amount of force; (4) the severity of the security problem at issue;

(5) the threat reasonably perceived by the officer; and (6) whether the plaintiff was actively resisting. *Id*. at 397.  Assessments of the reasonableness of force must be made from the perspective of a jailer who is often forced to make split-second decisions in tense situations. *Fairchild v. Coryell Cnty., Tex.*, 40 F.4th 359, 363 (5th Cir. 2022) (citing *Kingsley*, 576 U.S. at 399).

Plaintiff's claim is that Deputy Matthew used excessive force by compelling Plaintiff to walk from the transport van to the entrance of the hospital and by grabbing Plaintiff's arm and "compell[ing]" him towards the entrance.  (Doc. No. 13, p. 42.)  As discussed above, Plaintiff alleges that Deputy Matthew transported Plaintiff by van to the hospital, that upon arrival Deputy Matthew gave at least two orders to Plaintiff to exit the van, and that Deputy Matthew then forced Plaintiff to walk into the emergency room, despite Plaintiff's pleas for a wheelchair because he allegedly felt unable to walk or stand up straight due to the pain and swelling his illness had caused.  (Doc. No. 1, p. 9; Doc. No. 13, p. 43.)  In "forcing" Plaintiff's compliance with his directive towards the entrance, Plaintiff claims that Deputy Matthew grabbed his arm and "practically forced/compelled" him forward.  (Doc. No. 13, pp. 42-43.)  Plaintiff claims that he collapsed upon entry into the hospital and that Deputy Matthew again grabbed Plaintiff's arm "to drag/pull him down [a] short hallway." *Id*. at 43.

Weighing the *Kingsley* factors, Plaintiff's claims, taken as true and liberally construed, do not plausibly allege objectively unreasonable force.  The first *Kingsley* factor—the relationship between the need for the use of force and the amount of force used—weighs against Plaintiff. Deputy Matthew's repeated orders that Plaintiff exit the van were met by Plaintiff's resistance to those orders, through Plaintiff's counter-request for a wheelchair.  In the face of Plaintiff's failure to comply, the need reasonably existed to use some quantum of force to get Plaintiff into

the hospital, despite Plaintiff's insistence that he could not walk from the transport van.  (Doc. No. 13, pp. 42-43.)  *See Calhoun v. Wyatt*, No. 6:11-cv-4, 2013 WL 1882367, at *6 (E.D. Tex. May 2, 2013) (inmate's refusal to obey orders "set the stage for the use of force"); *Dillon v. Moore*, No. H-17-0204, 2018 WL 2317700, at *5 (S.D. Tex. May 22, 2018) (Atlas, J.) ("Use of force is considered an appropriate response where an inmate refuses to obey repeated orders."); *Minix v. Blevins*, No. 6:06cv306, 2007 WL 1217883, at *24 (E.D. Tex. Apr. 23, 2007) (even where inmate believes an order to be "unjustified and improper, this does not give him the right to disobey them at his whim").  Also significant, Plaintiff does not allege that he had any initial issues with Deputy Matthew using the same measure of "force" at the jail before transporting Plaintiff to the hospital: Deputy Matthew had taken Plaintiff by the arm to "assist" Plaintiff into the transport van because of Plaintiff's alleged ailments.  (Doc. No. 13, pp. 40-41.)  Deputy Matthew's assisting Plaintiff into the transport van demonstrates the need for the use of some measure of physical contact to support Plaintiff's mobility, and was balanced with the amount of force used, regardless of whether Plaintiff thought the use of "force" was necessary.

The circumstances surrounding the second and third *Kingsley* factors— Plaintiff's injury and any effort made by Deputy Matthew to temper or limit the amount of force—also weigh against Plaintiff.  While the Supreme Court has not required a particular quantum of injury, *Kingsley*, 576 U.S. at 397, the Fifth Circuit and district courts have consistently dismissed cases where the inmate alleges nothing more than a *de minimis* injury.  *See, e.g.*, *Siglar v. Hightower*, 112 F.3d 191, 193-94 (5th Cir. 1997) (affirming dismissal of excessive force claim as *de minimis* where injury consisting of "a sore, bruised ear lasting for three days"); *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997) (sore muscles, scratches, abrasions, and bruises do not rise above the level of a *de minimis* injury and are insufficient to support an excessive force claim);

*Gonzales v. Rowe*, No. 5:20-CV-052-BQ, 2020 WL 481105, at *4 (N.D. Tex. July 27, 2020)

(officers' actions which caused plaintiff to suffer hernia pain and skin irritation for 28 hours did

not amount to excessive force in light of the *de minimis* injuries suffered).  A temporary

aggravation of a pre-existing condition may also constitute a *de minimis* injury.  *See, e.g.*,

*Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005) (plaintiff's "at most very minor injuries,

likely nothing more than the temporary and slight aggravation of pre-existing conditions" are no

more than *de minimis* and therefore were insufficient to establish an excessive force claim);

*Peña-Borrero v. Estremeda*, 365 F.3d 7, 10-12 (1st Cir. 2004) (plaintiff failed to state a plausible

excessive force claim where the officers' use of force to handcuff plaintiff exacerbated pre-

existing, non-obvious injuries).

Plaintiff alleges, at most, that he was subjected to a one-time use of force by Deputy

Matthew.[18]  Deputy Matthew's purported use of force to bring Plaintiff into the hospital from the

transport van was brief, and Plaintiff alleges no physical injury or even any lasting pain resulting

from Deputy Matthew's conduct.  Even after being directed by the Court to specify the injuries

he suffered, Plaintiff states only that the existing pain and suffering from the symptoms of his

illness made the walk into the hospital more "excruciating," and that he collapsed twice before

he was placed in a wheelchair. (Doc. No. 13, p. 43.)  Plaintiff's alleged additional pain, without

more, is at most a *de minimis* injury because he, soon after walking into the hospital, was aided

by both a hospital orderly and Deputy Matthew.  Deputy Matthew's brief physical contact with

Plaintiff was limited, and so the second and third *Kingsley* both weigh against Plaintiff.

---

[18]  *Cf. Andrew v. St. Tammany Parish Prison*, CA No. 15-2105, 2016 WL 447680, at *11 (E.D. La. Jan. 15, 2016)
(applying the *Kingsley* factors and finding failure to state a claim where plaintiff was "subjected to a minor, one-
time use of force . . .[, and] the deputy's conduct was very brief and caused plaintiff no physical injuries").

The fourth and fifth *Kingsley* factors—the severity of the security problem at issue and the threat reasonably perceived by the officer – are at best neutral.  Accepting Plaintiff's allegations as true, although Deputy Matthew was transporting Plaintiff to the hospital, Plaintiff was in a public space, and the allegation reflects that Deputy Matthew was transporting him alone, without backup or support from any other officer.  Additionally, Plaintiff disobeyed Deputy Matthew's initial orders to get out of the van upon arrival.  Plaintiff does not contend that there was no security issue; at the same time, his allegations give no indication that Plaintiff posed, or gave the impression of posing, a particular security threat for any other reason.  The fourth and fifth *Kingsley* factors are neutral at most.

The sixth *Kingsley* factor - whether Plaintiff was actively resisting - weighs against Plaintiff.  As stated above, Plaintiff asserted that Deputy Matthew gave repeated orders to Plaintiff to get out of the van and walk to the entrance of the hospital; Plaintiff admits that he resisted those orders by failing to comply and requesting a wheelchair.  This is active resistance sufficient to tip the sixth factor against Plaintiff.  Plaintiff does not allege that Deputy Matthew exerted any additional force on Plaintiff after he escorted Plaintiff into the hospital.

Considering the *Kingsley* factors in totality, the undersigned finds that Deputy Matthew's use of force was not objectively unreasonable and therefore concludes that Plaintiff has failed to state a plausible Fourteenth Amendment excessive force claim.  Plaintiff's excessive force claim against Deputy Matthew should be dismissed.

### 7.  The Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

Plaintiff also brings two state law claims against Nueces County, under Section 273.2 of the Texas Administrative Code and under the Texas Tort Claims Act,[19] for Plaintiff's injuries

---

[19]  Tex. Civ. Prac. & Rem. Code § 101.

from the alleged denial of adequate medical care.  (Doc. No. 1, p. 10, 16; Doc. No. 13, p. 11.)
The undersigned also liberally construes Plaintiff's claims that Sheriff Hooper violated Sections
351.041 of the Texas Local Government Code, 273.2 of the Texas Administrative Code, and
511.009(a)(1)-(5), (a)(19)(B), and (d)(1) of the Texas Government Code.  (Doc. No. 13, p. 15.)

When relying on a statute to provide a basis for relief through § 1983, a plaintiff must
show that the particular statute provides an "unambiguously conferred right" with an
"unmistakable focus on the benefitted class."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002);
*see also Vote.Org v. Callanen*, __ F.4th __, 2023 WL 8664636, at *6 (5th Cir. 2023) (private
cause of action may be implied when a statute contains rights-creating language and displays an
intent to create a private remedy).  Additionally, under Texas law, a private right of action under
a statute "may be implied only when a legislative intent to do so appears in the statute as
written."  *Brown v. De La Cruz*, 156 S.W.3d 560, 567 (Tex. 2004).  Plaintiff bears the burden of
demonstrating that a statute confers a private right of action.  *See Finch v. Pharr*, No. 5:17-CV-
209, 2018 WL 10582181, at *6 (N.D. Tex. May 29, 2018) (collecting cases and noting that
burden lies with plaintiff to establish that a statute gives rise to a right enforceable through §
1983).

Under the Texas Tort Claims Act, a private right of action is expressly stated.  *See* Tex.
Civ. Prac. & Rem. Code § 101.025(b) ("A person having a claim under this chapter may sue a
governmental unit for damages allowed by this chapter.")  But Plaintiff fails to allege or
demonstrate that Section 273.2 of the Texas Administrative Code provides him with a private
right of action, and the undersigned's research reveals no suggestion of a legislative intent to
create a right of private action or any caselaw to indicate a right of private action exists under
Section 273.2.  Thus, Plaintiff could not pursue a claim against Nueces County or Sheriff Hooper

under Section 273.2 of the Texas Administrative Code in any court, state or federal. Additionally, review of Section 351.041 of the Texas Local Government Code likewise reveals no suggestion of any legislative intent to create a private right of action, and the undersigned found no caselaw indicating such a right that could support Plaintiff's attempted action against Sheriff Hooper under that section.

Although not specifically contained within § 511.009, § 511 of the Texas Government Code, which outlines the "Commission on Jail Standards," generally details a procedure for complaints regarding jails under its jurisdiction.  The Texas Court of Appeals has stated that, "where the relevant statutes are silent on a private right of action but provide detailed administrative enforcement mechanisms, we may presume that the legislature intended that a separate private right of action not be included." *Tex. Med. Res., LLP, v. Molina Healthcare of Tex., Inc.*, 620 S.W.3d 458, 464 (Tex. Ct. App. 2021).  Thus, Plaintiff cannot bring an action against Sheriff Hooper under § 511, either.

Supplemental jurisdiction can exist only when there is a federal claim over which the district court possesses jurisdiction.  *See* 28 U.S.C. § 1367(a) (supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").  If a court possesses jurisdiction exists but then disposes of a plaintiff's claims for other reasons, the court would have discretion whether to exercise supplemental jurisdiction over any state law claims.  *See* 28 U.S.C. § 1367(c)(3).  The general rule in this circuit is that state law claims should be dismissed when the federal claims to which they are pendent are dismissed.  *See Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992); *see also Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) (citing

*Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999) ("The general rule is that a court should decline to exercise jurisdiction over remaining state-law claims when all the federal-law claims are eliminated before trial ....").

There is no federal interest in adjudicating Plaintiff's lone remaining state law claim under the Texas Tort Claims Act. No significant amount of federal resources have been devoted to this Court's consideration of Plaintiff's state law claim. *Cf. Enochs v. Lampasas Cnty.*, 641 F.3d 155, 159 (5th Cir. 2011) (citing common law factors of judicial economy, convenience, fairness, and comity in deciding whether to retain supplemental jurisdiction over state claim). There is simply no reason to retain Plaintiff's state law claim in federal court. The undersigned therefore recommends dismissal Plaintiff's state law claim without prejudice to his raising that claim in a state court. *Cf. Lucky Tunes #3, L.L.C. v. Smith*, 812 F. App'x 176, 184-85 (5th Cir. 2020) (dismissal of claim without prejudice, when based on decision not to exercise supplemental jurisdiction).

### E. Claims not specifically addressed in this Memorandum and Recommendation.

To ensure justice and access to the courts, courts interpret pleadings of *pro se* litigants liberally. *See United States v. Robinson*, 78 F.3d 172, 174 (5th Cir. 1996) (citing *United States v. Santora*, 711 F.2d 41, 42 (5th Cir. 1983)). *Pro se* actions will not be dismissed based on technical pleading defects and should be construed to ensure such claims are given fair and meaningful consideration despite the unrepresented litigant's unfamiliarity with the law. *See Haines*, 404 U.S. at 520-21; *see also Estelle*, 429 U.S. at 106 (*pro se* parties are normally accorded more leniency in the construction of their pleadings).

The undersigned has liberally construed Plaintiff's complaint and his responses to the Court's questionnaire to give his claims fair and meaningful consideration. The undersigned has

attempted to articulate and analyze Plaintiff's claims in an impartial manner consistent with providing appropriate leniency to *pro se* litigants while at the same time requiring compliance with applicable pleading and screening standards. To the extent Plaintiff is attempting to raise a claim not specifically addressed by the undersigned in this Memorandum and Recommendation, Plaintiff has failed to state such claim with sufficient factual detail or clarity to allow the claim to be identified or analyzed by the Court.

As stated previously, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Again, Plaintiff must allege sufficient facts in support of its legal conclusions that give rise to a reasonable inference that Defendant is liable. *Id*.; *Twombly*, 550 U.S. at 556. Further, the factual allegations must raise Plaintiff's claim for relief above the level of mere speculation. *Twombly*, 550 U.S. at 555. Therefore, Plaintiff is advised that any claim not addressed in this Memorandum and Recommendation is not currently before this Court because Plaintiff has failed to allege sufficient facts or state such claims clearly.

### F. Leave to amend?

The undersigned is recommending dismissal of Plaintiff's claims. "When the dismissal of a *pro se* complaint is appropriate, it should generally be done without prejudice in order to allow the plaintiff an opportunity to file an amended complaint." *Rodriguez v. United States*, 66 F.3d 95, 97 (5th Cir. 1995). But leave to amend need not be granted if amendment would be futile – for example, if an amended complaint would still fail to state a claim upon which relief may be granted. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (futility of amendment is adequate justification to refuse to grant leave to amend).

"If the prisoner has filed his complaint and submitted questionnaire responses, then the court may conclude that he has pleaded his best case such that granting him further leave to amend would be futile or cause unnecessary delay." *Clark v. Waddell*, No. 7:22-cv-00059-M-BP, 2023 WL 8605313, at *18 (N.D. Tex. Nov. 15, 2023) (citing *Witherspoon v. Waybourn*, No. 4:20-cv-1150-P, 2021 WL 2635917, at *10 (N.D. Tex. June 25, 2021) and *McLean v. King*, No. 3:20-cv-1244-C-BK, 2020 WL 6049297, at *2 (N.D. Tex. Sept. 15, 2020)); *see also Mejia v. Monroe*, No. H-18-3036, 2021 WL 765726, at *2 (S.D. Tex. Feb. 26, 2021) (Miller, J.) (finding that inmate had pleaded his best case where he was afforded an opportunity to plead facts supporting his claim through a more definite statement).  Here, Plaintiff has had the opportunity to plead his best case against Defendants, including through his lengthy responses in completion of the Court's questionnaire, but none of his claims are viable.  The undersigned therefore recommends dismissal without leave to amend.

### G. Conclusion and recommendation.

The undersigned recommends the following:

- The district court should DISMISS Plaintiff's federal claims with prejudice as frivolous or for failure to state a claim upon which relief may be granted;

- The district court should DISMISS Plaintiff's state law claims without prejudice; and

- The district court should NOT grant Plaintiff leave to amend his complaint.

### H. Notice.

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within 14 days after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate

Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), and General Order No. 2002-13, United States District Court for the Southern District of Texas. A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

      SIGNED on January 5, 2024.

MITCHEL NEUROCK
United States Magistrate Judge